## CUNNINGHAM v. PETTIGREW.

(Circuit Court of Appeals, Eighth Circuit. January 23, 1909.)

No. 2,755.

1. MINES AND MINERALS (§ 54*)—FRAUDULENT CONCEALMENT—DUTY TO DISCLOSE FACTS—JOINT PURCHASERS OF PROPERTY.

A lease for mining claims gave the lessees an option to purchase the property for $75,000, and by another and separate contract the owner agreed, in case of purchase, to refund to them $35,000 of the purchase money. By false representations and showing the lease, while concealing the fact of the other agreement, the lessees induced complainant to become a joint purchaser with them, paying $37,500 for a half interest in the property. Not having sufficient money, the lessees applied to defendant, stating the facts and showing him both contracts, and he agreed to advance the money necessary to make the payments until the real consideration of $40,000 should be paid, when he was to secretly receive the subsequent payments made by complainant. For this accommodation he was to receive interest, and also a third interest in the lessees' half of the property. The first payment of $20,000 was made, when complainant became suspicious and refused to pay more, and through some arrangement with the lessees defendant completed the payments and obtained title to the property. Held, that by intentionally joining with the others in the deception of complainant he became a joint purchaser and assumed the obligations of good faith incident to that fiduciary relationship, and that both he and the property in his hands were liable for the amount necessary to make restitution for the fraud.

[Ed. Note.—For other cases, see Mines and Minerals, Dec. Dig. § 54.*]

2. TRUSTS (§ 95*)—CONSTRUCTIVE TRUSTS—FRAUD IN ACQUISITION OF PROPERTY.

Where one was induced by fraud to contribute to the purchase price of real property, the title to which became vested in another, who was cognizant of the fraud and received the benefit of the payment, such owner and the property are both chargeable with a constructive trust in favor of the person defrauded to the extent of the amount paid by him.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. §§ 145–147; Dec. Dig. § 95.*]

3. CONTRACTS (§ 259*)—GROUNDS FOR RESCISSION BY PARTY—FRAUD.

The right to rescind a contract on the ground of fraud depends on the existence of the fraud, and not on the accuracy or conclusiveness of the party's knowledge of it when he exercises the right.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 1153–1172; Dec. Dig. § 259.*]

4. CONTRACTS (§ 272*)—RESCISSION—ACTS CONSTITUTING RESCISSION.

Where a party to an executory contract, after part performance, unequivocally refused to further perform on the ground of fraud, and his refusal was accepted by the other parties as conclusive, there was a com-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

plete rescission which fixed the rights of the parties without the necessity of a suit.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 1192, 1193; Dec. Dig. § 272.*]

5. EQUITY (§ 87*)—LACHES—SUIT FOR RELIEF ON THE GROUND OF FRAUD—DUE DILIGENCE.

Rev. St. Utah 1898, § 2877, limits the time for bringing an action for relief on the ground of fraud to three years after the cause of action accrued; provided, however, that the "cause of action in such cases shall not be deemed to have accrued until the discovery by the aggrieved party of the facts constituting the fraud." Complainant entered into a contract with others for the joint purchase of a mine in Utah, and they made the first payment thereon. Before the second came due complainant became satisfied that there was a secret agreement between his associates and the vendor by which he was being defrauded, and refused to make further payments, whereupon the purchase was completed by his associates and defendant, and the title to the mine became vested in defendant, who was in fact a party to the fraud, although not a party to the contract. Complainant caused inquiries to be made of the vendor, but was unable to obtain confirmation of his suspicions until three years later, and a year afterward, when he first secured evidence of a secret agreement by which the vendor was to return to his associates nearly one-half of the nominal price of the mine and that defendant was to share in the benefits, he brought suit in equity to charge defendant and the property with a trust in his favor. Held, that he was under no duty to make inquiries directly of the parties implicated respecting the fraud, which was essentially one of concealment, nor to file a bill of discovery, and that, applying the state statute by analogy, the suit was within the time limited, and complainant was not barred from relief by laches, the situation of the parties not having materially changed.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 242–244; Dec. Dig. § 87.*]

6. EQUITY (§ 75*)—LACHES—CONSIDERATIONS AFFECTING.

The defense of laches is affected by the facts whether rights of innocent persons have intervened, whether witnesses are dead or have disappeared, whether the situation of the parties in interest has changed, and other like considerations.

[Ed. Note.—For other cases, see Equity, Dec. Dig. § 75.*]

7. EQUITY (§ 65*)—HE WHO COMES INTO EQUITY MUST COME WITH CLEAN HANDS—NATURE OF UNCONSCIONABLE CONDUCT.

Conduct by a complainant toward the defendant which would have been inequitable as between co-tenants cannot affect complainant's right to maintain the suit in equity, where any relation of co-tenancy between the parties had been previously wholly repudiated and was not recognized by either party.

[Ed. Note.—For other cases, see Equity, Dec. Dig. § 65.*

He who comes into equity must come with clean hands, see note to Knapp v. S. Jarvis Adams Co., 70 C. C. A. 543.]

8. EQUITY (§ 65*)—HE WHO COMES INTO EQUITY MUST COME WITH CLEAN HANDS—CONDUCT WITH RESPECT TO DIFFERENT TRANSACTIONS.

The inequity which will repel one from courts of equity under the maxim that "he who comes into a court of equity must do so with clean hands" must relate directly to the very transaction concerning which he complains.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 185–187; Dec. Dig. § 65.*]

Philips, District Judge, dissenting.

Appeal from the Circuit Court of the United States for the District of Utah.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

In October, 1901, James Johnston, the owner of certain unpatented mining claims in Nevada, executed a written lease to one Hyde, and in the same instrument gave him an option to purchase the leased property on or before the expiration of the lease, upon the payment of $75,000, in installments as follows: $20,000 on or before December 20, 1901; $15,000 on or before February 20, 1902; $15,000 on or before April 20, 1902; $15,000 on or before June 20, 1902; and $10,000 on or before August 20, 1902. Simultaneously with the execution of the lease, Johnston executed another paper modifying the option agreement by agreeing to refund to Hyde the sum of $35,000 out of the payments when made, making the real consideration to be paid for the claims $40,000 instead of $75,000. Although Hyde's name alone appeared as lessee, one Jesse W. Fox, his friend, was interested equally with him in the venture. Negotiations were soon set on foot to interest the complainant, Pettigrew, in the project. Hyde, acting for himself and Fox, exhibited the first-mentioned paper to him to show the terms and conditions of their option, but concealed from him the existence and contents of the second paper. Pettigrew agreed to take one-half interest in the purchase and to pay $37,500 therefor on the assurance that Hyde and Fox were taking the other half interest at the same cost. The latter, not having the necessary money, approached defendant Cunningham for assistance. He was informed of the true condition of things —the real price required, and the pretended price. In fact, the two agreements with Johnston were exhibited to him, and we are satisfied from the evidence that the purpose of deceiving Pettigrew and inducing him to become apparently equally interested with Hyde and Fox on the same terms, but really to pay practically the full option price for the whole mine in order to secure an undivided half of it, was made known to Cunningham. As a result of negotiations, Cunningham agreed to advance for Hyde and Fox one-half of the several installments as they became payable, until such advances, together with what Pettigrew paid, should reach the sum of $40,000, the true consideration. For this accommodation Cunningham was to receive 8 per cent. interest on the money advanced, and one-third of Hyde's and Fox's interest, or one-sixth interest in the whole mine.

The further payments as they became due from Pettigrew were to be formally paid to Johnston, but surreptitiously returned to Cunningham in satisfaction of the advances made by him to Hyde and Fox. The proposed result was that if Pettigrew should complete his payments on the basis of the option, represented to him to be $75,000, his one-half would cost him $37,500, and the one-half of Hyde, Fox, and Cunningham would cost $2,500. There was some deal between Hyde and Fox and Cunningham with reference to paying this $2,500 which need not now be stated. The evidence, although somewhat conflicting, satisfies us that Hyde and Fox originally entered into a fraudulent scheme to get Pettigrew to pay for the whole mine and to secure one-half for themselves at the nominal price of $2,500 or less, and that defendant, Cunningham, with full knowledge of the purpose, soon after joined them in it. Their venture was to be a joint one. They and Pettigrew were to become joint purchasers of the mine. Pettigrew trusted Hyde and Fox, not knowing at first that Cunningham was interested with them, and, on the faith of their representations concerning the cost of the mine and their willingness and ability to go in with him on an equal footing, entered upon performance of the agreement. He paid $10,000, one-half of the first installment due December 20th, and Hyde and Fox paid the other half in a check of Cunningham's, which they exhibited to Pettigrew to show their ability to perform. Before the next installment fell due on February 20, 1902, Pettigrew became suspicious that he had not been treated fairly, and then or soon after refused to make further payments. Some new deal was made between Hyde and Fox on the one hand and Cunningham on the other by which Cunningham advanced the necessary amount to make the further payments of $20,000 due to Johnston. Hyde and Fox failed to repay the advances made by Cunningham, and ultimately, on July 1, 1902, the title to the mine became legally and equitably vested in Cunningham alone. After repeated and unsuccessful efforts to verify his suspicion, Pettigrew was on October 17, 1904, by a letter written to him by Fox, and later in the fall of 1905, by an inspection of the real option agreement, advised of the true facts of the case, and on October

26, 1905, instituted this suit against Cunningham to secure either a conveyance to him of a one-fourth interest in the mine, or the return of the amount of money with interest which he had paid, or any other relief consistent with the facts of the case. The court below awarded Pettigrew a judgment for $16,035.54, and.a lien upon the property in the nature of a mortgage to secure the payment of the same. From this decree the defendant appeals.

Andrew Howat (H. R. Macmillan, on the brief), for appellant.

J. L. Rawlins, for appellee.

Before HOOK and ADAMS, Circuit Judges, and PHILIPS, District Judge.

ADAMS, Circuit Judge (after stating the case as above). The bare recital of the facts of this case discloses the existence of a flagrant breach of trust among business associates between whom a relation of confidence and trust existed for which the law ought to furnish a remedy, and we think it does. Plainly stated, Hyde and Fox devised a scheme to get one-half of the mine for nothing by inducing the complainant, Pettigrew, to become a joint purchaser of it with them under the belief that he was paying only one-half of the purchase price thereof. In the case of Walker v. Pike County Land Co., 71 C. C. A. 593, 139 Fed. 609, which involved facts very similar to those now under consideration, this court, speaking of the defendant in that case, said:

"As a joint purchaser he stood in a fiduciary relationship to his associates, and was bound to the utmost good faith in his dealings with them. The law demanded of him, not only that he should not be guilty of positive fraud, but that he should not conceal from them any fact material to the transaction. Any profit which he secured by violating this legal duty he was bound to account for to them."

That is wholesome morals as well as sound law. If the deal had been executed according to the original design—that is, if complainant had paid on the basis of $75,000 for the mine, and Hyde and Fox had secured as a result of that payment a one-half interest in the mine with complainant as originally intended—there would be no doubt that complainant would be entitled to some form of redress against them. Does the fact that defendant, Cunningham, acquired the title in the way indicated in the statement of the case, exonerate him or the mine owned by him from responsibility? We think not. The evidence satisfies us that defendant knew of the fraud intended to be practiced on complainant, and that he aided in its accomplishment by agreeing to advance the money to Hyde and Fox for that purpose and to take one-sixth interest in the mine as his reward. The evidence, including the undisputed fact that both the false and true option agreements were exhibited to Cunningham at the outset of negotiations with him, to say nothing of the testimony of witness Fox, which is criticised, convicts Cunningham of inconceivable stupidity, or charges him with knowledge of the purpose to deceive Pettigrew while he was negotiating with Hyde. Let him speak. While testifying in his own behalf he was asked this question:

"In the conversation you had on or about the 8th day of December, what, if anything, was said by Mr. Hyde as to how much money he wanted you to advance, and what interest in the property they would give you if you did so?"

To which he made the following answer:

"Mr. Hyde stated that the net price he had to pay to Mr. Johnston was $40,000; that Mr. Pettigrew was to pay $37,500 for one-half, and that I was to advance money enough for Hyde to pay the balance; and that the subsequent payments from Senator Pettigrew were to come to me. When the final payment was made, there would be $2,500 that would still be owing on the property by him; otherwise I would have the balance refunded to me. In consideration of my doing that, loaning them the money, at 8 per cent. per annum interest, he agreed to give me as a bonus one-third interest of the profit that was realized out of their one-half interest."

Again, on cross-examination, Cunningham was asked:

"Q. Hyde came to you and says, 'Now, here: Fox and myself and Pettigrew are going in to buy this property from Johnston, and Fox and I, if the transaction goes through, are going to get our one-half interest at a net outlay of $2,500, and Pettigrew is going to pay the balance. I have had a contract drawn up showing the consideration to be $75,000, which I have shown Pettigrew, and Pettigrew has agreed to put up $37,000.' That is about what Hyde told you, isn't it? A. Well, in substance—yes."

This and other evidence of like character given by him satisfies us of Cunningham's intentional co-operation with Hyde and Fox in the deception of Pettigrew. They all became, according to their respective interests, joint purchasers of the property in controversy, and Cunningham assumed the obligations incident to that relationship to complainant, and, like Hyde and Fox, became bound to the utmost good faith in his dealings with him.

The trial court reached the same conclusion on other grounds equally tenable. In answer to the contention of defendant's counsel that Hyde, having the option to buy the mine for $40,000, was at liberty to sell it for any obtainable price he could get, the learned trial judge said, "This would only be true if Hyde had done nothing to conceal the fact which was not disclosed." Hyde, Fox, or defendant, if not occupying a confidential relation, were not bound to disclose anything to complainant. They could have observed strict silence as to terms of their option as well as concerning their interest in the purchase, and if complainant had treated with them at arm's length, relying on his own judgment, he could not lawfully complain; but in this case the facts are not that way. The indubitable fact is that they not only suppressed the truth, but affirmatively misrepresented and concealed material and important facts within their exclusive knowledge, and thereby distracted complainant's attention from the real facts of the case, and caused him to enter into a contract which otherwise he would not have done. Such being the case, their conduct was fraudulent irrespective of the breach of the confidential relationship existing between them. Files v. Rankin, 82 C. C. A. 491, 153 Fed. 537, and cases cited; Laidlaw v. Organ, 2 Wheat. 178, 4 L. Ed. 214; Stewart v. Wyoming Ranch Co., 128 U. S. 383, 388, 9 Sup. Ct. 101, 32 L. Ed. 439; Tyler v. Savage, 143 U. S. 79, 12 Sup. Ct. 340, 36 L. Ed. 82; C. & A. R. R. Co. v. Shea, 66 Ill. 471.

Induced by their fraudulent conduct, complainant innocently invested $10,000 in the mine now owned by defendant. His money to that extent aided the ultimate acquisition of title by defendant, and went into the property. Defendant holds the legal title, but he ac-

quired it, to the extent of one-fourth thereof, by means of the fraud practiced upon complainant. Ordinarily trusts arise from agreements, express or implied, manifesting an intention to create them. But there is another class of trusts which arise as a result of frauds committed by one party upon another, and they are known as "constructive trusts." Perry on Trusts, § 166. Such a trust arises when, among other things, a person clothed with some fiduciary character, by fraud or other wrongful conduct, gains some advantage himself. Perry on Trusts, § 27. This court in Trice v. Comstock, 57 C. C. A. 646, 121 Fed. 620, 61 L. R. A. 176, held that a fiduciary relation and a breach of duty imposed by that relation are sufficient to raise a constructive trust. To the same effect are Burnes v. Burnes, 70 C. C. A. 357, 137 Fed. 781, and Steinbeck v. Bon Homme Mining Co., 81 C. C. A. 441, 152 Fed. 333.

Measured by the test thus declared, the facts of the present case, in our opinion, clearly and unequivocally charge defendant and the mine to which he holds the legal title with a constructive trust in favor of complainant to the extent of his money which went into it. The trial court by its decree awarded complainant a personal judgment against defendant for $10,000, with interest from December 20, 1901, the date of payment by complainant, and the further sum of $1,000, which will be explained later, and fastened a lien upon the mine for that aggregate amount until paid. This was perhaps less, or at any rate a different remedy, than the complainant was entitled to. When a constructive trust is raised in favor of another, the courts may order the trustee to hold the legal title for the benefit of the person deceived, or may decree a reconveyance of the property to the fiduciary entitled to it on such terms and conditions as are deemed best. But the complainant has not appealed, and is satisfied with his personal judgment against defendant, with the lien to secure its payment. This relief comes fairly within the scope of the prayer for general relief, and is well warranted by precedent.

Speaking of constructive trustees, Pomeroy in his work on Equity Jurisprudence, vol. 3, § 1080, where sustaining authorities are cited, says:

"The trustee incurs a personal liability for a breach of trust by way of compensation or indemnification, which the beneficiary may enforce at his election. * * * The trustee's personal liability to make compensation for the loss occasioned by a breach of trust is a simple contract equitable debt. It may be enforced by a suit in equity against the trustee himself, or against his estate after his death."

Defendant invokes the rule expressed in Upton v. Tribilcock, 91 U. S. 45, 23 L. Ed. 203, Grymes v. Sanders, 93 U. S. 55, 23 L. Ed. 798, and Richardson v. Lowe, 79 C. C. A. 317, 149 Fed. 625, and cases cited, requiring vigilance to detect fraud and prompt repudiation of a contract based on fraud as a necessary prerequisite to rescission, and contends that complainant is barred from recovery by that rule. It is urged that complainant as early as February, 1902, either knew or had the means of knowledge of the fraud practiced by Hyde and his associates, or failed to exercise due care and diligence in discovering it, and that he failed to rescind within due time thereafter. The facts

of the case afford a sufficient answer to this contention. If actual rescission was necessary as a perequisite to enforcing the constructive trust created by defendant's fraud, as to which it is unnecessary to express an opinion, the complainant did in fact rescind the contract as soon as he had a suspicion of the fraud which had been practiced upon him. In February, 1902, when the second installment of purchase money became due, he refused to pay his portion of it; he refused to perform his contract obligation, and left his associates to their own devices. He was guilty of no vacillation. He announced his purpose and adhered to it. This was an unequivocal act of repudiation on his part. His associates so understood it, and acted accordingly; they understood he would no longer act with them or further perform his part of the joint undertaking, and immediately made a new arrangement, totally inconsistent with any claim of continuing obligation on the part of complainant, for completing the payment of the mine. They accepted the refusal as a conclusive act of rescission. Although complainant acted on suspicion only, he was justified in rescinding, provided his suspicions of fraud were subsequently verified. The right of rescission depends on the existence of the fraud, and not on the accuracy or conclusiveness of the party's knowledge of it when he exercises the right. Peterson v. Chicago, Milwaukee & St. Paul Ry. Co., 38 Minn. 511, 39 N. W. 485; Lawson on Contracts, § 248. By his prompt rescission his associates were left in no uncertainty, and he was foreclosed of any opportunity to speculate on the success or failure of the venture. The die was irrevocably cast. In some cases the institution of a suit to rescind is the first act of repudiation and rescission; but it is not the only way to bring it about. Rescission is a fact, the assertion by one party to avoidable contract of his right (if such he had) to avoid it, and when the fact is made known to the other party, whether by a suit or in any other unequivocal way, the rescission is complete. As a result of it, a suit may or may not be necessary. In the present case the facts which justified the rescission and the rescission itself affected defendant and the mine owned by him with a constructive trust in favor of complainant, and this resultant right is what complainant seeks to establish and enforce in this action. This remedy follows, and is entirely consistent with the rescission which had been accomplished.

But it is claimed that this remedy is barred by the laches of complainant. Courts of equity, in considering the defense of laches, while not bound by the provisions of statutes of limitations applicable to actions at law of like character, usually proceed in analogy with them. Boynton v. Haggart, 57 C. C. A. 301, 120 Fed. 819.

Section 2877 of the Revised Statutes of 1898 of Utah applicable to this case limits the time within which an action for relief on the ground of fraud or mistake can be brought to the period of three years after the cause of action accrued, provided, however, that the—.

"cause of action in such cases shall not be deemed to have accrued until the discovery by the aggrieved party of the facts constituting the fraud."

It may be conceded that discovery of the fraud within the purview of this statute occurs when the party invoking it has notice of the main

facts constituting the fraud, or has the means of discovery in his power. Wood v. Carpenter, 101 U. S. 135, 25 L. Ed. 807; Redd v. Brun, 84 C. C. A. 638, 157 Fed. 190, and cases cited. Whether due diligence is observed for the discovery of fraud is largely dependent upon its peculiar character in a given case. Mr. Justice Miller, speaking for the Supreme Court in Norris v. Haggin, 136 U. S. 386, 392, 10 Sup. Ct. 942, 945, 34 L. Ed. 424, said:

"It is a part of this general doctrine that, to avoid the lapse of time or statute of limitation, the fraud must have been one which was concealed from the plaintiff by the defendant, or which was of such a character as necessarily implied concealment."

This cause of action, except for the alleged undisclosed fraud, accrued in December, 1901, when complainant paid $10,000 of the purchase price of the mine. This suit was not instituted until October 26, 1905, but we cannot say, in view of the facts disclosed by the proof, that complainant knew, or had means of discovering, the fraud before October, 1904, when one of the participants gave him detailed information upon which, when further corroborated by papers obtained from Mrs. Cunningham in the fall of 1905, he subsequently acted and brought this suit.

The facts are briefly these: In the first place, the fraud complained of was in its nature secret, and required actual concealment for its successful accomplishment. The complainant resided in South Dakota, and had no occasion to visit Utah, and did not do so after the first of the year 1902 until about the time this suit was brought. Cunningham and Hyde, who resided in Utah, where the transaction was had, were both absent from that state a considerable portion of the time between December, 1901, and 1905. In February, 1902, complainant had a suspicion that Johnston was not getting the full sum of $75,000 for the mine, but he had no information sufficient to warrant a suit against anybody, and particularly against defendant Cunningham, the only solvent participator in the fraud. Later, and at different times, the complainant secured the services of two men to interview Johnston, the seller of the mine, to ascertain if possible the real facts, but Johnston repeatedly refused to impart any information to them. Neither of the parties to the original transaction nor any of their witnesses had died or disappeared, the title to the mine had not fallen into innocent hands, and the situation of the parties in interest had not otherwise been materially changed. The facts just recited should be kept in mind in making proper application of the equitable doctrine of laches to this case. Mere lapse of time is interposed to protect the defendant from accountability for inequitable conduct towards one who in lawful reliance upon his good faith was deceived. It cannot escape observation that this is not a highly equitable attitude. This court in treating of a similar case, Stevens v. Grand Central Min. Co., 67 C. C. A. 284, 133 Fed. 28, speaking by Judge Van Devanter, said:

"Statutes of limitation, applied in courts of law, are inflexible and framed upon the theory that mere lapse of time, irrespective of other considerations, should bar the claim, while the doctrine of laches, applied in courts of equity, is sufficiently flexible to give reasonable effect to the special circumstances of any case, and rests not alone upon the lapse of time, but upon the inequity of

permitting the claim to be enforced because of some change in the condition or relations of the property or the parties. * * * If unusual conditions or extraordinary circumstances make it inequitable to permit the prosecution of a suit after a briefer, or to forbid its maintenance after a longer, period than that fixed by analogous statute, the chancellor will not follow the statute, but will determine the case in accordance with the equities which arise from its own conditions or circumstances."

The doctrine so declared applies with great force to the present case. No rights of innocent persons are here involved, and no change of circumstances has occurred which would tend to prevent the ascertainment of the truth. With these wholesome principles in view, let us consider what is claimed to constitute laches fatal to recovery by the deceived party. It is said Pettigrew ought to have inquired of Cunningham, Hyde, and Fox, or some of them, concerning the fraud, and that his failure to do so was negligence on his part. It seems to us that the unreasonableness of expecting those men, who were the perpetrators of the fraud, to voluntarily give self-inculpating evidence, excused any effort to induce them to do so. Their personal interest, the strongest of human motives, impelled them not to do so, and any attempt to secure from them information which would necessarily expose them to civil liability, at least, for their wrongful conduct, would, in our opinion, be not only an unreasonable requirement, but one which might have thwarted any ultimate discovery. In such circumstances we cannot regard the failure to do so as fatal laches.

Attention is called to the case of Geyser-Marion Gold Min. Co. v. Stark, 45 C. C. A. 467, 106 Fed. 558, 53 L. R. A. 684, as authority for the proposition that the duty rested on Pettigrew to resort to Cunningham, Hyde, and Fox for discovery of the fraud, but we fail to find in it authority for defendant's present contention. The facts in that case disclosed no such fraudulent conduct as is involved in this case, and no reason appeared why the officers of the bank there charged with negligence in transferring a certificate of stock should not have resorted to the trustee named in the certificate with confident expectation of securing information concerning his cestui que trust.

It is suggested that the bill itself fails to disclose sufficient excuse for the delay in bringing this suit beyond the period permitted by the statute of limitation; but we think this is not so. The facts which under the statute of Utah excused the bringing of the action within the time limited by the statute, to which we have already called attention, appear by direct averment or by necessary implication in the bill, were fully proved at the trial, and, in our opinion, were sufficient to postpone the running of the statute. They were certainly sufficiently specific to satisfy the defendant, as no exception was taken to the bill on that account. It is also suggested that the complainant might, after his suspicion had been aroused, have instituted a suit, either a bill for discovery or an action at law against Hyde, Fox, and Cunningham, or some of them, and by the discovery, or by a deposition taken in the case, might have learned the fraud. We do not think the rule of diligence applicable to this matter requires such an experimental and expensive proceeding in court. This suit was instituted well within the time prescribed therefor by the statute of Utah after the discovery of

the facts constituting the fraud, and we perceive no reason why we should not observe the analogy of that statute in this equitable action.

It is next contended that complainant does not come into court with clean hands, and should therefore be dismissed without relief. The inequitable conduct charged against him is briefly this: He, claiming an interest in the mine by reason of the use of his money in acquiring title to it, and by reason of the fact that he had expended money in developing it, and Fox, claiming some interest in it by reason of work done and money expended by him, in the early part of the year 1905, endeavored to protect their interests in another way. Defendant, Cunningham, claiming that he had acquired Hyde's and Fox's interest in the mine, applied for a patent for the claims as originally located. Pending this application complainant and Fox, maintaining that there were defects in the original locations, and that there had been a failure to do some of the annual assessment work, relocated some of the claims, filed adverse claims to defendant's application, and instituted the requisite suits in support thereof. Defendant invokes the principle that complainant as a co-tenant, and bound by the obligations which mutual interests imposed, could acquire no outstanding title to the exclusion of his co-tenant, and that the attempt to do so was inequitable. Conceding the rule stated to be correct, its application to this case is not perceived. Defendant strenuously denies the existence of any obligations incident to the relationship of co-tenants between him and complainant. Complainant makes no claim of any co-tenancy after he rescinded his contract of purchase on suspicion of the fraud which had been practiced upon him. Accordingly, in 1905, when complainant and Fox undertook to relocate the mining claims, there was no rule of law which prevented it. The true attitude was that of belligerency. Complainant had a cause of action against the defendant for relief on the ground of fraud, and nothing more. We can perceive no reason why he might not properly and equitably re-enforce his position to secure the money invested by him by acquiring the outstanding legal title to the mining claims in which he had an equitable right. He owed defendant no duty springing from any existing confidential relation which stood in his way.

If, however, it be conceded that the conduct of complainant in 1905 was inequitable in the respect complained of, it would not affect complainant's right to relief for the wrong done in 1901 and 1902 now sued for. The one is quite independent of the other. The supposed inequity involved in the attempt made in 1905 to prevent the complainant from securing a patent has no relation in time, character, or circumstance to the equity sought to be enforced in this action. It is well settled that the inequity which will repel one from courts of equity under the maxim that "he who comes into a court of equity must do so with clean hands" must relate directly to the very transaction concerning which he complains. Shaver v. Heller & Merz Co., 48 C. C. A. 48, 108 Fed. 821, 834, 65 L. R. A. 878; Trice v. Comstock, supra, and cases cited therein.

The trial court awarded complainant a judgment and lien for $1,000 and interest, in addition to the $10,000 and interest already considered.

This first-mentioned sum appears to have been advanced by complainant to Hyde prior to December, 1901, before defendant had any connection with the purchase of the mine. It was advanced under an agreement that Hyde should use it for development purposes. The proof fails to show that it was secured by any fraudulent conduct of Hyde, and much less of defendant, Cunningham. It also fails to show that the money was actually expended in any way beneficial to the mine. We see no reason for charging defendant, Cunningham, with, or subjecting his property to, a lien for this money.

The decree below must be modified by reducing the amount of complainant's recovery to the extent of $1,000 and interest allowed thereon; in all, $1,457.77. In all other respects the decree as rendered was right, and is affirmed. One-tenth of the costs of this appeal and one-tenth of cost of the transcript will be taxed against the appellee, the remainder against the appellant. The cause is remanded to the Circuit Court, with directions to make the required modification.

PHILIPS, District Judge (dissenting). A more detailed and exact statement of the issues presented by the bill of complaint and the evidence will better develop the questions of law and fact involved in this discussion. The bill is framed upon the theory that Hyde, representing himself and Fox, after he had obtained an optional contract from Johnston for the actual consideration of $40,000, to be paid in installments, had a contemporaneous written contract expressing the consideration to be $75,000, and that Cunningham, with knowledge thereof, entered into a conspiracy with Hyde and Fox to sell an undivided one-half interest in the property to Pettigrew at $37,500, and that Hyde, in pursuance of this fraudulent conspiracy, represented to Pettigrew that the actual purchase price to be paid to Johnston was $75,000, and that Pettigrew was given to understand that he was being admitted into the adventure on equal terms, and that in reliance upon the knowledge of Hyde and Fox as miners and of the mines in question, and upon said assurances, he was induced to agree to buy the one-half interest at $37,500, and to pay thereon the sum of $10,000, one-half of the first installment due December 21, 1901. The bill alleges that before the 20th day of February, 1902, when the second installment became due, the complainant was informed and believed that Hyde, Fox, and Cunningham had entered into some scheme to cheat and defraud him, and that the real purchase price for the mining claim was not as represented, but he remained in ignorance of the nature of said scheme and the real purchase price of said property; that on account of the information he possessed he refrained from making any further advancement on the contract. The bill further alleges that, pursuant to the confederation between Hyde, Fox, and Cunningham, the latter was to advance one-half the installment to be paid on the contract, and was to receive back the sum of $10,000 out of the third installment, and all of the fourth and fifth installments; that upon the refusal of the complainant to make further payments Cunningham paid the sum of $20,000, which, with the first $20,000, constituted the full purchase price of said mining claims; that by reason of the premises said Cunningham became and ever since has been, and still

is, a trustee of an undivided one-fourth interest in said mining claims, for the benefit of the complainant.

The prayer of the bill is that Cunningham be decreed to be a trustee for the complainant as to an undivided one-fourth interest in said mining claims, and by a good and sufficient deed of conveyance he be required to convey to the complainant the said undivided one-fourth interest; and, in the event that the complainant is unable to procure the relief aforesaid, Cunningham be decreed to pay him the sum of $11,000, with interest thereon from the 18th day of December, 1901; and for such other and different relief as may be deemed equitable and proper, in accordance with the facts stated therein.

The evidence shows that Pettigrew and Fox were acquaintances and friends of long standing, and that Hyde first met Pettigrew in the spring of 1901. They were then, and for some time afterwards, jointly interested in a mining adventure. The circumstances which brought Hyde and Pettigrew together, after Hyde obtained the option contract from Johnston, are as follows: Pettigrew was interested in other mining property in the state of Nevada, and as he was going out to examine it he telegraphed Hyde to procure for him a mining expert to meet him at Ogden, Utah. As Hyde was going out to examine the mines on which he held said option contract, they met by agreement at Ogden, and went out together to Nevada. At Pettigrew's instance, Hyde accompanied him to see his (Pettigrew's) mine, after which the latter accompanied Hyde to look at the mines in question. It was on this trip that Hyde informed Pettigrew of his option and the contract with Johnston, which expressed $75,000 as the purchase price, and his hope to sell the property in time to raise the required sum to meet the first payment due December 20, 1901, as otherwise he did not have the money. Whereat Pettigrew expressed a willingness to come in and take a half interest if the property proved satisfactory on further examination before the expiration of the option. It was then agreed between them that Pettigrew would furnish the money for the development work in the meanwhile to prove the value of the mine. The $1,000 mentioned in the majority opinion was furnished by Pettigrew for that purpose.

Hyde, after his return to Salt Lake City, made arrangement with a third party to loan him the $10.000 to meet his one-half of the first payment; but as the time for this payment approached, he discovered that said friend had gone to New York and might not return in time for him to rely upon this source of assistance. Thereupon, perhaps about the 8th day of December, 1901, he called upon Cunningham to see if he could obtain from him the necessary money. Cunningham was a resident of long standing in Salt Lake City, of high respectability, president of a bank, and was understood to be a man of wealth. Cunningham was unwilling to make this advancement without a personal inspection of the mines, to be advised of the probability of getting his money back. Accordingly, he and Hyde went out and made an inspection of the mines, brought back some specimens, and after having them assayed Cunningham consented to advance the money to meet Hyde's one-half of the installments as they became due on the option contract, with the understanding, ac-

cording to his testimony, and as I hold all the facts and circumstances confirm, that Hyde and Fox (the latter being understood to be associated with Hyde in the purchase) were to pay him 8 per cent. interest per annum on the money advanced, and a bonus of one-third of the profit Hyde and Fox might make out of the adventure, or in case of sale by them of the property.

It is not borne out by the evidence, as stated in the majority opinion, that Cunningham at that time, or at any other time, was shown the two written agreements between Johnston and Hyde. Cunningham distinctly denied this in his cross-examination, and there is no contradictory proof. It is conceded, however, that Hyde did advise Cunningham that when the $40,000 was paid to Johnston the deed to Hyde would be delivered. Both Hyde and Cunningham, the only persons present at their convention, testified that the $10,000 advanced by Cunningham was only a loan, to be repaid to him out of the first moneys received, either on a sale of the property by Hyde or of surplus money received from Pettigrew, and the bonus of one-third of the profit realized by Hyde and Fox. As proof of the loan of the $10,000, Hyde and Fox at the time of its advancement executed to Cunningham their promissory note therefor.

Pettigrew did not return to Utah until just a few days prior to the 20th of December, 1901. He was unwilling to make the payment of the first $10,000 until after he made further inspection of the mines. Accordingly, Hyde met him at Ogden, and they revisited the mines, and after further inspection Pettigrew brought samples therefrom to be assayed in Salt Lake City. They arrived at the latter place about two or three days before the date of the maturity of the first payment, and, as the assays were not completed in time to satisfy Pettigrew by the 20th of December, Johnston consented that the first payment might be made on the 21st day of December. On the last-named date Pettigrew, being satisfied with the result of the assay, gave his check for the $10,000 and Cunningham gave his to Hyde for a like sum, which were turned over to the bank that held the deed in escrow from Johnston.

It is conceded, as it must be, that the instant Pettigrew parted with his money, if obtained from him by fraudulent representations and deceit, a cause of action arose to recover it from Hyde. The majority opinion seems to proceed upon the theory that Pettigrew likewise at the time could have maintained action directly against Cunningham for a judgment in personam for the recovery of the $10,000 advanced by the former. This position, it must be conceded, is sustainable alone upon the ground that Cunningham was particeps criminis in the alleged fraudulent representation and deceit which induced Pettigrew to part with his money. This would present a simple action for fraud and deceit ad damnum. To sustain such an action, it is the settled law that the burden rests upon the actor to show that the defendant made a representation as to a material fact, that such representation is false, not believed by the defendant to be true, that it was made with the intent that it should be credited and acted on, and that the complainant in ignorance of the fact relied thereon. Or, as stated by Mr. Justice Catron, in Lord et al. v. Goddard, 13 How.,

loc. cit. 211, 14 L. Ed. 111, "this action could not be sustained without proving actual fraud in the defendant, or an intention to deceive the plaintiff by false representations." In other words, it must be a false representation and deceit practiced by the defendant. See Schagun v. Scott Mfg. Co. (C. C. A.) 162 Fed., loc. cit. 213.

The evidence is undisputed that, when Pettigrew paid the $10,000, he and Cunningham had never met, and had never had a word of conversation respecting this or any other subject. The whole dealing in regard to the sale was between Pettigrew and Hyde. By its direct averment the bill predicates the actionable fraud perpetrated upon Pettigrew of the fact that Hyde gave him to understand that he was being admitted into the transaction on the basis of one-half of the sum Hyde was in fact to pay Johnston for the property. This is the gist of the complaint. For, as Pettigrew bought in only after personal examination of the mines and assays of samples selected by himself, he had no cause of action without said assurance. As Cunningham made no such assurance to Pettigrew, the only ground upon which accountability can be attached to him must be that when the false assurance was given to Pettigrew there existed a conspiracy between Hyde, Fox, and Cunningham to thus deceive and cheat Pettigrew, and that any representations or assurances thereafter made by Hyde in furtherance of the conspiracy are binding upon Cunningham. This record has been searched through in this division of opinion without developing one iota of tangible proof to support the suggestion of any such conspiracy on the part of Cunningham. The majority opinion asserts the proposition, in effect, that if Cunningham knew that Hyde was selling to Pettigrew a one-half interest in the property at $37,500, when the whole consideration to be paid to Johnston was only $40,000, it was a fraud on Pettigrew, and that Cunningham thereby "aided in its accomplishment by agreeing to loan the money to Hyde for that purpose and to take a one-sixth interest in the mine as his reward." This postulate is predicated, in my judgment, of both a misconception of the law and the facts. It is the recognized American doctrine that it does not vitiate a contract of A. to loan B. money to carry out such a contract. To render the lender particeps criminis, the evidence must go further and show that by some additional, positive, overt act the lender assisted the contriver of the fraud in its perpetration.

This is illustrated by the early English case of Holman v. Johnson, Cowp. 341, growing out of the sale of goods in France by a Frenchman to an English subject for the known purpose of being smuggled into England in violation of her revenue laws; and also by the case of Faikney v. Reynous, 4 Burr. 2069, in which the rule was laid down that to make the vendor, as the lender, particeps criminis, he should do some act, such as in so shipping and marking the goods as to conceal the fact that they were being smuggled. But mere knowledge of the vendor, or lender, of the unlawful intent on the part of the vendee, or borrower, does not make the former a participant in the guilt or wrong of the latter. Tracy v. Talmage, 14 N. Y. 162, 170, 67 Am. Dec. 132; Williams v. Campbell, 3 Metc. (Mass.) 209; Graves v. Johnson, 179 Mass. 53, 58, 60 N. E. 383, 88 Am. St. Rep. 355; Anheuser-Busch

Brewing Association v. Mason, 44 Minn. 318, 46 N. W. 558, 9 L. R. A. 506, 20 Am. St. Rep. 580; Kerwin & Company v. Doran, 29 Mo. App., loc. cit. 406, and citations; Michael v. Bacon, 49 Mo., loc. cit. 476, 8 Am. Rep. 138; Howell v. Stewart, 54 Mo. 400.

The advancement of the $10,000 by Cunningham, for which he took the note of Hyde and Fox at four months, with interest at 8 per cent., to meet the first payment by Hyde, did not even give Cunningham an equitable lien on the property therefor, much less an interest in the res itself. Eyster v. Hatheway, 50 Ill. 521, 525, 99 Am. Dec. 537; Heuisler v. Nickum, 38 Md. 279; Wooldridge v. Scott, 69 Mo. 669; Price v. Estill, 87 Mo. 381.

Cunningham's testimony was that, as an inducement to him to advance the $10,000 and subsequent installments due by Hyde, he was to receive a bonus of one-third of the profits Hyde might make out of the transaction. That his version of the understanding is correct is irrefutably demonstrated by the acts and conduct of all the parties to that compact. When on the approach of the maturity of the second payment, in February, 1902, Hyde informed Cunningham that Pettigrew declined to go further with the sale by making the payment then maturing, Cunningham declared his unwillingness to put into the transaction any further money, which would require $20,000 from him to meet the payment due the 20th day of February, 1902, unless, as security for his protection, the legal title to the property was put in him. This was finally acceded to by Hyde and Fox on the distinct agreement that the latter were to develop the property without expense to Cunningham, with an option to them to sell within a given time and make recompense to Cunningham for the money advanced by him. Hyde and Fox failing to make the sale within the prescribed time, Cunningham became insistent for his money, but yielded to another extension of the time of redemption. This period having again expired, Cunningham demanded possession of the property, which Hyde and Fox refused to yield. Cunningham's testimony respecting this, which is without contradiction, is that in the option that was given to Hyde and Fox in August, 1903:

"We figured up at the time the amount of money I had advanced and interest on it, and gave him credit for the difference, this $2,400 and whatever it was, on that, leaving a balance at that time of about $31,000 or $32,000, and that was mentioned as the purchase price under that option."

This would cover the $30,000 advanced by Cunningham and interest. When, as stated, the last extension had expired, and Cunningham was insisting on Hyde and Fox yielding possession of the property to him, and their refusal, they met in the law office of Judge Howat, who advised the parties that under the agreement between them Cunningham held the legal title only as an equitable mortgagee to secure him for his advancements, and therefore he could not oust Hyde and Fox summarily, but would have to resort to a proceeding of foreclosure. After some parleying this was agreed to, to save the expense and delay. Hyde and Fox made Cunningham a quitclaim deed to the property and surrendered the possession, he delivering up to them their said promissory note for the $10,000. All of which clearly confirms Cunningham's

contention that he never came into the transaction as a speculative purchaser with Hyde and Fox, but as a lender for hire of the money. So that, had Hyde and Fox at any time returned him his money and paid for the use and risk of the loan, he was bound to have surrendered all claim to them. At most, the case presented was a mere promise as a means of compensating Cunningham for the risk of the credit given Hyde and Fox, and did not constitute between them the relation of equitable joint tenants. No case of recognized authority can be found supporting the proposition that such agreement brings it within the rule of making Cunningham particeps criminis in the alleged fraud by Hyde, constituting it an act by Cunningham in aid thereof. The evidence is all one way that the representations and assurances which Pettigrew testified constituted the inducement to him parting with his money came from Hyde anterior to Cunningham's advancing the money, which clearly brings Cunningham within the protection of the rule laid down in Armstrong v. Toler, 11 Wheat. 258, 6 L. Ed. 468, that if the promise be entirely disconnected from the illegal act, and is founded on other considerations, it is not vitiated by the act, "although it was known to the party to whom the promise was made."

The learned counsel who drew this bill of complaint did not conceive that he could present a case, even on paper, based on the ground that it was sufficient to bind Cunningham or the property for restitution of the money paid by Pettigrew by alleging that when Cunningham agreed to advance the money he knew that Hyde was to account to Johnston for only $40,000. Therefore, it was distinctly charged in the bill that Cunningham came in as a part purchaser with Hyde with knowledge of the claimed fact that to induce Pettigrew to become a part purchaser Hyde represented to him that he was to be admitted on the basis of the actual purchase price to be paid to Johnston.

The only reliance for support of the charge aforesaid, suggested by appellee's counsel, is the testimony of the man Fox. This witness, by his whole conduct in this case, his treachery first and last to both sides, transferring his allegiance to whichever afforded the best prospect of gain to himself, is not entitled to be credited without strong corroboration. The cross-examination of this witness demonstrated beyond reasonable contention that his testimony in this respect inculpatory of Cunningham was wholly hearsay, so much so that the sense of justice of the majority would not permit them to rest their judgment upon this man's statements. But the majority opinion says, let Cunningham speak for himself, and then proceeds to quote an isolated question, in the form of an argument and bald assumption of a fact not proven, and the answer thereto. I earnestly protest that such is hardly a fair treatment of Cunningham's testimony. Hyde testified that he never did say to Pettigrew that the $37,500 was one-half of the sum he was to pay Johnston for the property, and Cunningham testified distinctly that he never heard of such a statement having been made by Hyde to Pettigrew until the taking of testimony herein. He stated that while he knew Hyde held a contract from Johnston expressing the consideration to be $75,000, and was to account for only $40,000, that such option contracts were quite usual; and that in letting Hyde have the mon-

ey he did not consider that that matter concerned him. He was then asked on cross-examination if Pettigrew was to have one-half and he a one-sixth interest in the property.

"A. I was to have a one-sixth in the profit. Q. You were to have a one-sixth interest in the mine, weren't you? A. No, not in the mine, because I didn't expect to put up money to develop the property. * * * My understanding was one-sixth interest in the profit. * * * I had nothing to do with the expenses. They were to pay all expenses, and I was only going to get one-third of the profit. If there was no profit in it, I wouldn't get any, only my 8 per cent. interest on the investment, and my principal, of course. * * * I had no interest in the mine at all, excepting in the profit."

Then counsel interrogating inquired of Cunningham if it did not strike him as singular that Pettigrew was going to pay $37,500 for a one-half interest and pay all the expenses of development.

"A. No, sir. * * * It is an everyday occurrence all over the country. * * * Q. And you say positively, now, as I understand you, that you never asked Hyde or Fox to show you any correspondence between them and Pettigrew at any time? A. No, sir; I never did, at any time. Q. You saw the agreement between Johnston and Hyde? A. I saw that at the time that I made the second payment."

The cross-examiner followed this up with the question: If the taking of that contract from Johnston was not for the purpose of leading the purchaser to think that the consideration was much higher than the real one?

"A. No, sir; that isn't the intent. * * * The object of a different price is that a party can make a sale and make a profit over and above the original amount."

Again, the question was put to him to the effect if he did not believe on the 8th day of December, 1901, and also on the 21st day of December, before the money was paid, that Hyde had induced Pettigrew to believe that the real consideration was $75,000, for the property.

"A. Not from the way he told it to me. Q. You had no doubt that that was true at that time, had you? A. No; I don't think so. I think it was just as he stated."

Having failed, as thus shown, to establish the essential, issuable fact, counsel then, as if it were a mere question of casuistry, and in an argumentative way, put the hypothetical question mentioned in the majority opinion and the answer quoted; but the witness further stated: "It might be a little different." He was then inquired of if Hyde had not held out to Pettigrew, by showing him the contract, that the consideration was $75,000, and whether or not Pettigrew would ever have gone into such an arrangement; to which he answered:

"I didn't believe he would go into it unless, after his examination of the mine, it would warrant him in paying that for it."

After that counsel put the distinct question that Pettigrew, having been invited by Hyde to go and see the property, had undertaken to put up some money for development, and Hyde had shown him a contract with Johnston reciting the consideration to be $75,000, and Pettigrew had undertaken to take one-half of the property and pay one-half of the consideration, the witness began the answer as follows, "All I

know about that," whereat he was interrupted by counsel with the question:

"Q. Didn't you know that on December 8th, 1901? A. No, sir; I didn't know anything about that; never heard about that until to-day, when Hyde was on the witness stand. * * * He didn't tell me anything about the contract, as he stated here, that expired on the 31st of December. I never heard of that until to-day."

Then he was asked if he ever heard about a deed from Hyde to Pettigrew which was drawn up and presented for signature.

"A. No, sir; never heard of it until it was produced here before the chancellor; that is the first intimation I had of it."

So, taking Cunningham's evidence in its extremest view in favor of the appellee's contention, it treads back to the fundamental proposition, hereinbefore discussed, that Cunningham's knowledge that Hyde was selling the one-half interest to Pettigrew for $37,500, when he was to account to Johnston for only $40,000, did not render Cunningham particeps criminis in the alleged fraud, as he did no act to impose upon Pettigrew or to influence his action.

The bill, as already shown, was framed upon the theory that Cunningham became in equity a joint purchaser with Pettigrew, and was impressed with the obligations of a fiduciary relation, in which equity exacts absolute equality of right and fair dealing; and, therefore, while Cunningham held the legal title to the property, Pettigrew is an equitable tenant in common to the extent of the purchase money paid by him. The majority opinion, at times, adopts this theory, and in support thereof cites the case of Walker v. Pike County Land Company, 139 Fed. 609, 71 C. C. A. 593, where an agent for the sale of land joined with others in purchasing the same for speculative purposes, under an agreement that a holding corporation should be formed. It was held that he stood in a fiduciary relationship to his associates in the purchase, and as to them he was bound to the utmost good faith, and, because he misrepresented to them the price paid (whereby he obtained a secret profit on the sale), he was accountable to the corporation and his associates, as the sole stockholders, for such profits. If this suit were alone between Pettigrew and Hyde, that case would be relevant; but it fails of applicability in that Cunningham, at the time that Pettigrew made his first payment, had not come into the transaction as an associate with Hyde to make a sale of the property to Pettigrew as another associate in a joint adventure. And later on the majority cite the case of Stevens v. Grand Central Min. Co., 133 Fed. 28, 67 C. C. A. 284, which asserts the equitable principle that co-tenants in a mining claim stand in a fiduciary relation to each other, so that neither by relocating or by adverse acquisition can exclude the equitable rights of the other. Yet the majority opinion asserts that:

"In February, 1902, when the second installment of purchase money became due, he (Pettigrew) refused to pay his portion of it; he refused to perform his contract obligation, and left his associates to their own devices. He was guilty of no vacillation. He announced his purpose and adhered to it. This was an unequivocal act of repudiation on his part. His associates so understood it and acted accordingly; they understood he would no longer act with

them or further perform his part of the joint undertaking, and immediately made new arrangement, totally inconsistent with any claim of continuing obligation on the part of the complainant, for completing the payment of the mine. They accepted the refusal as a conclusive act of rescission."

Such finding is not predicated of any allegation in the bill—a rescission of the contract is not asserted or relied on by the pleader. But if the finding be correct, what right had Pettigrew to complain of any subsequent act or conduct of Cunningham in respect of the property? If Cunningham, as. he had a right to do, had likewise refused to put up another dollar for Hyde and then abandoned the whole matter, the option contract would have been forfeited on February 20, 1902, and Cunningham would have lost the $10,000 advanced to Hyde and Fox, and Pettigrew would have lost the $10,000 paid by him, as he claims that Hyde and Fox are both insolvent.

I do not understand that a complainant can occupy the two positions the decree and the opinion assume. If Pettigrew abandoned and repudiated the contract in February, 1902, and his refusal was accepted "as a conclusive act of rescission," he could neither in law nor equity thereafter assert any right under the contract to the property, and his remedy would have been an action at law to recover back the money which had been obtained from him by fraud and deceit, in which action the parties would have been entitled to a trial by jury. Having elected, as the majority opinion asserts, he must adhere to it; he cannot play fast and loose. It is the settled rule of law that where the attitude of a party is one of complaint of a fraud perpetrated in a contract of sale of interest in land, if he claim a rescission, he must take his position immediately upon the discovery; and he is not at liberty to hesitate and delay and wait for a future view of his own convenience, or the chances of the market value of the property, before determining the question of the affirmance or rescission of the contract. "He must on the discovery of the fraud elect to rescind, or to treat the transaction as a contract." Hart v. Handlin, 43 Mo. 172–175; Taylor v. Short, 107 Mo. 392, loc. cit. 393, 17 S. W. 970. How can he, after waiting three years and eight months, come into a court of equity, asserting the right of an equitable owner of an interest in the property based on a contract with Hyde that he was to pay according to what Hyde was to pay Johnston, praying that—

"Cunningham be decreed to be a trustee for your orator as to an undivided one-fourth interest of said mining claims hereinbefore described, and by good and sufficient deed of conveyance to convey the said undivided one-fourth interest thereof to your orator; or, in the event that your orator is unable to procure the relief aforesaid, that the said Cunningham be decreed to pay to your orator the sum of $11,000, with interest thereon from the 18th day of December, 1901?"

And the decree affirmed by the majority is, first, a straight judgment in personam against the defendant for the money advanced by Pettigrew, with interest from the date of payment; and then, treating the case as one in equity, that in some way the complainant was entitled to an equitable lien on the property (which the opinion asserts he abandoned in February, 1902), the decree orders Cunningham to execute a mortgage on the whole property to secure the money judg-

ment; and, as evidencing the court's notion that the complainant had an equitable interest in the property, it further decreed "that thereupon said complainant be debarred from claiming any other right in respect to said claims or either of them."

### The Statute of Limitation and Laches.

If it were conceded that Pettigrew ever had a cause of action against Cunningham, either at law or in equity, it arose on the 21st day of December, 1901, when Pettigrew parted with his money. This cause of action was barred in three years thereafter, to wit, the 21st day of December, 1904, unless the facts constituting the fraud were not discovered within that period, in which event the statute would not attach until such discovery. The settled rule of pleading, where the action is not brought within the statutory period of limitation, is that the complainant must specifically plead and prove—

"what the impediments were to the earlier prosecution of his claim; how he came to be so long without knowledge of them; the means, if any, by which the defendant concealed them; how and when he first came to know them; and such other facts and circumstances as would appeal to the conscience of a chancellor." Redd v. Brun, 157 Fed. 192, 84 C. C. A. 640.

So Judge Story, in Stearns v. Page, 1 Story, 204, 215, 217, Fed. Cas. No. 13,339, said:

"And especially must there be distinct averments of the time when the fraud, mistake, and concealment, or misrepresentation, was discovered, and how discovered, and what the discovery is, so that the court may clearly see whether, by the exercise of ordinary diligence, the discovery might have been before made. For, if by such diligence the discovery might have been before made, the bill has no foundation on which it can stand in equity, on account of the laches." See Hardt v. Heidweyer, 152 U. S. 547, 559, 14 Sup. Ct. 671, 38 L. Ed. 548; Johnston v. Standard Mining Company, 148 U. S. 360, 370, 13 Sup. Ct. 585, 37 L. Ed. 480; Foster v. Mansfield & Coldwater Railroad Co., 146 U. S. 88, 100, 13 Sup. Ct. 28, 36 L. Ed. 899.

The excuse pleaded in the bill for the delay is: (1) That the defendants since December, 1901, had been absent from their homes in Salt Lake City about two years; and (2) that the complainant was not in possession of all the facts in detail; that while he learned a portion of the facts on the 17th day of October, 1904, to wit, that only $40,000 was paid for said mining claims, yet he did not learn all the particulars until his solicitor obtained copies of all the documents between Johnston and Hyde. An analysis of these excuses and the evidence in support of them will demonstrate their insufficiency. In the first place, it is not obvious why the absence of Hyde and Cunningham from their homes should have obstructed the institution of a suit in equity for relief. A proceeding in rem could have been instituted in the state of Nevada, where the land was located, and service by order of publication. The complainant's equitable rights in and to the claimed interest in the property could have been enforced without the personal appearance of Cunningham or Hyde. But the evidence shows that Cunningham did not visit the Sandwich Islands until December, 1903, returning to his home January 25, 1904. He visited Mexico in September, 1904, for about five days, and on his return home was ill at El Paso, Tex., for about three weeks. He visit-

ed the state of California two or three times, but was not absent over a week at a time. Hyde was absent altogether, during the three years, for four or five months, while the evidence of Pettigrew himself shows that he was absent from his home, in New York, Mexico, and California, two years of the time. He does not disclose in his excuse what particular effort he made to discover the facts, nor the means by which the defendant concealed them. Nor does the bill state what essential fact necessary to constitute notice was not disclosed by said Fox. Objection to the sufficiency of the excuse pleaded is not waived by failure to demur. Redd v. Brun, supra; Willard v. Wood, 164 U. S. 502, 524, 17 Sup. Ct. 176, 41 L. Ed. 531.

It is the settled rule applicable to such a statute as that of Utah that the discovery by the aggrieved party of facts constituting the fraud dates from the time the party has notice of the particular facts in question, or is conscious of having the means of knowing, although he may not employ them for the purpose of gaining further information. Notice in such case "embraces all degrees and grades of evidence, from the most direct and positive proof to the slightest circumstance from which notice might be inferred"; and, where he has knowledge of any fact sufficient to put him on inquiry as to the existence of a fact, he is presumed either to have made the inquiry and ascertained the extent thereof, or to have been guilty of a degree of negligence fatal to his claim to be considered by a court of equity. Williamson v. Brown, 15 N. Y. 359; Leading Cases in Equity (3d Ed.) 152.

In Wood v. Carpenter, 101 U. S. 135, 143, 25 L. Ed. 807, the rules are declared as follows:

"Whatever is notice enough to excite attention and put the party on his guard and call for inquiry is notice of everything to which such inquiry might have led. When a person has sufficient information to lead him to a fact, he shall be deemed conversant of it. * * * Concealment by mere silence is not enough. There must be some trick or contrivance intended to exclude suspicion and prevent inquiry. * * * The circumstances of the discovery must be fully stated and proved, and the delay which has occurred must be shown to be consistent with the requisite diligence."

In Johnston v. Standard Mining Co., 148 U. S. 370, 13 Sup. Ct. 589, 37 L. Ed. 480, the court said:

"The law is well settled that, where the question of laches is in issue, the plaintiff is chargeable with such knowledge as he might have obtained upon inquiry, provided the facts already known by him were such as to put upon a man of ordinary intelligence the duty of inquiry."

Accordingly, in Foster v. Mansfield & Coldwater Railroad Company, 146 U. S., loc. cit. 99, 13 Sup. Ct. 32, 36 L. Ed. 899, the court said:

"The defense of want of knowledge on the part of one charged with laches is one easily made, easy to prove by his own oath, and hard to disprove; and hence the tendency of courts in recent years has been to hold the plaintiff to a rigid compliance with the law which demands, not only that he should have been ignorant of the fraud, but that he should have used reasonable diligence to have informed himself of all the facts."

Aside from the admissions in the bill, Pettigrew testified that between the first payment and the next installment due he was advised that Hyde was dishonest and tricky—that by reason of information

he had received from one Wilson, who had just sold to Johnston a part of the mines in question amounting to about one-fourth, at a price that indicated that the whole group had not cost Johnston over $36,000; and that, therefore, some time in the forepart of January, before the second payment became due, he placed the matter in the hands of his counsel at Salt Lake City, who, to test Hyde, drew up a deed from him to Pettigrew for the one-half interest in the property, reciting that, by the terms of the agreement between them, "each of said parties is to advance and pay one-half of the cost of acquiring the same." This Hyde refused to sign, but presented, instead, a deed drawn by himself omitting that recitation. On the 8th day of January, 1902, the said counsel wrote Pettigrew advising him of what he had done in the premises; that Hyde, after looking over the deed, declined to sign it, and had written a deed leaving out said recital; that he had urged Hyde as strongly as possible, without disclosing the object, to sign the first deed, and he was unable to give any valid excuse for not doing so. It must be conceded that this was sufficient to create more than a suspicion. It was a tacit admission on Hyde's part that he was unwilling to admit the truth. And most certainly Pettigrew ought not now to be heard to controvert the effect of this action on the part of Hyde when he himself deemed the information he had sufficient to warrant him in not proceeding further with the execution of the contract. Moreover, Pettigrew's counsel called on Johnston to ascertain the facts, and his counsel informed him by letter that Johnston refused to give any information. In this letter his counsel advised him, in view of the conversation he had with Johnston, that "the transaction was not straight." Again, on the 5th day of February, 1902, his counsel wrote to Pettigrew that he believed with him that:

"The proof of the facts supposed to exist will eventually be forthcoming, and I also think that I can perhaps be of some service to you in ferreting out these matters, or at least put you in communication with some people who know something in relation to the facts. I think, however, it would be well to let the matter rest until your arrival here, when we can discuss the same in all its different phases."

On September 11, 1902, said counsel wrote Pettigrew that he was satisfied Hyde never put a dollar of his own money into the property in question, and he believed a thorough investigation would disclose the fact that the only money that went into the property was advanced by Pettigrew. In this letter he suggested that as Hyde was a very energetic man, and in time would doubtless succeed in making a considerable amount of money, it would be advisable "for you to obtain a judgment against him for the money advanced in case he does not return the same, which I have no idea that he will do. There is plenty of time, however, in which to commence such an action if you shall deem it advisable." All this was more than three years before the institution of this suit. His counsel thought there was sufficient evidence to obtain a judgment against Hyde, but Pettigrew acted upon his advice that there was plenty of time, and so he did nothing. According to his own testimony, he went off and spent half of his time in New York, Old Mexico, and California. He admits having passed through Ogden, only 37 miles from Salt Lake City, at least twice without stopping

over. He stated in one of his letters that he believed his "friend Fox" knew and would tell him the facts about the transaction; and Fox testified that he wrote to Pettigrew time and again asking him to call and see him, as he had something of information to discuss with him. He did not go to see Fox or even write to him. He was simply indifferent and let the matter drift. Cunningham testified that at any time he would have told Pettigrew all he knew about the transaction, as he had nothing to conceal. Although Pettigrew must have known that the $10,000 paid by Hyde on the 21st of December, 1901, was through the check of Cunningham, as he was present in the bank when the check was delivered, he never sought Cunningham or made any inquiry of him as to his relations to and knowledge of the transaction.

The majority opinion repudiates the idea that Pettigrew should be expected to have applied to the adversary for information. Of course, I would not lay it down as a hard and fast rule that the defrauded party should be regarded as derelict in duty under any and all circumstances for not applying to the adversary for information. His nonaction in this respect should be measured by the circumstances of the particular case. There was nothing in the attitude or character of Cunningham that did not invite an inquiry of him for information. He was a respected citizen and the president of a bank in Salt Lake City. Nothing would have been more natural than to have assumed that Cunningham had nothing to conceal and would have advised him of the actual facts. He knew, for he so testifies, that Hyde and Fox had no money, and that when he refused to put up his half of the money due on the 20th of February, 1902, the option would be lost unless Hyde and Fox procured some party to meet this payment. When Cunningham did meet it he took, as already stated, a deed from Hyde for the property, which carried the title from Johnston and vested it in Cunningham. This deed was duly recorded and therefore the most reasonable inquiry on the part of Pettigrew would have developed this fact.

In Curtis v. Lakin, 94 Fed., loc. cit. 254, 36 C. C. A. 225, Judge Thayer commented upon the failure of the complainant in that case "to have ever held personal communication with the defendant." And Judge Sanborn, in Geyser-Marion Gold Mining Company v. Stark, 106 Fed., loc. cit. 562, 45 C. C. A. 471, 53 L. R. A. 684, said:

"The old excuse for this dereliction that the word 'trustee' pointed to no one but the trustee himself, of whom inquiry could have been made, and such an inquiry would have been idle, because he who would violate his trust would make false answers, is again presented. Its futility has been often shown, and perhaps nowhere better than by Sir John Romilly, Master of the Rolls, in Jones v. Williams, 24 Bevans, 62."

The only criticism made upon this authority by the majority opinion is that there the party to be inquired of was the trustee, the force of which I do not perceive, because the excuse for not calling on the trustee, who was the offending party, was that "he who would violate his trust would make false answers." In the case of Jones v. Williams, above referred to, the Master of the Rolls, in discussing a cognate question, said:

"I concur in the argument of the plaintiffs' counsel that the rule with respect to the consequence of abstaining from making inquiries by purchasers

·does not depend exclusively on a fraudulent motive for such abstinence; and that though it be true, that a purchaser will be fixed with the knowledge of such facts as would have been contained in answers, which he would have got if he had put questions, which he refrained from asking solely from the fear of the consequences, still, in my opinion, the rule goes beyond this, and that whenever, from the circumstances of the case, the purchaser is put on inquiry, he must be fixed with the knowledge which that inquiry would have produced, although the omission to put the question did not proceed from any fraudulent motive. * * * With respect to the argument that it was unnecessary to make any inquiry because it would have led to no result, I think it is impossible to admit the validity of this excuse. I concur in the doctrine that a false answer, or a reasonable answer given to an inquiry made, may dispense with the necessity of further inquiry; but I think it impossible, beforehand, to come to the conclusion that a false answer would have been given which would have precluded the necessity of further inquiry.' A more dangerous doctrine could not be laid down, nor one involving a more unsatisfactory inquiry, viz., a hypothetical inquiry as to what A. would have said if B. had said something other than what he did say."

In view of the fact that Pettigrew was put upon inquiry by the refusal of Hyde to execute the deed with the recital aforesaid, and the refusal of Johnston to make any statement, the most natural thing, if he was exercising reasonable quest after further information, would have been to have gone to Cunningham, who was advancing the money and taking the title to the property, for information.

Furthermore, I insist that in view of the information that Pettigrew had, as aforesaid, he must be held to have been conscious of the means of obtaining full information more than three years before the institution of this suit. He was a lawyer, and he and his astute counsel are presumed to have known that they could have filed a bill of discovery against Hyde and Cunningham and compelled them to answer on oath, under the pains and penalties of perjury, as to the facts in question. This is the rightful office of such equity jurisdiction. He could have taken the deposition of Johnston and made him talk. Instead of this, he simply waited for them to make voluntary disclosures of the particulars, or he was entirely indifferent.

The excuse pleaded in the bill for not bringing suit, after receiving positive information that the real consideration to be paid by Hyde to Johnston was only $40,000, that he was not in possession of all the facts, is simply puerile. The fact which the bill admits, and which the evidence, without dispute, establishes, is that in October, 1904, within the three-years period, he was informed by Fox, one of the parties to the transaction, that the real consideration was only $40,000. He knew according to his testimony, prior to December 21, 1901, that Hyde had assured him he was being admitted as a purchaser of one-half interest on the basis of the purchase price to Johnston. Thus he knew the essential facts in controversy, and he had two witnesses—Fox and himself—to support it. But he pleads in extenuation of his failure then to sue that he did not see the written contracts between Hyde and Johnston until the 5th day of October, 1905. The law is that the subsequent discovery of some additional evidence of the fraud is no excuse for the failure to act energetically and promptly upon notice and knowledge of the essential facts. Such additional particulars "can only be considered as strengthening the evidence of the original fraud, and it cannot re-

vive the right of repudiation which has been once waived." Fry on Specific Performance of Contracts (2d Ed.) §§ 703, 704, approved by Sherwood, P. J., in Taylor v. Short, 107 Mo. 384, 393, 17 S. W. 970. In Curtis v. Lakin, supra, the syllabus is:

"The delay of plaintiffs in commencing suit against their copartner for dissolution and an accounting, and to declare a third person purchasing partnership property from him a trustee, is not excused by the fact that the partnership agreement had been misplaced, and was not found until shortly before the suit was commenced;" for the reason that they could and should have applied to the defendant therefor.

Indeed, there could be no limitation upon a party's delay in bringing such suit for relief, if it were an excuse that he was not in possession of all the evidence in its details, which is rarely developed until in the progress of the trial itself.

It is not to be lost sight of for one moment, in considering the question of the laches of Pettigrew in bringing this action, that the property on which he is seeking to impress an equitable interest, asserting an equitable co-tenancy in common with Cunningham, is mining property. With emphatic reiteration the courts have announced the rule that without reference to statutes of limitation, where property of a speculative character is involved, subject to contingencies as to value:

"It is the duty of a man complaining of fraud to put forward his complaint at the earliest possible time. He cannot be allowed to remain passive, prepared to affirm the transaction if the concern should prosper, or to repudiate it if that should prove to his advantage." Hayward v. National Bank, 96 U. S. 618, 24 L. Ed. 855.

In Patterson v. Hewitt, 195 U. S. 318, 319, 25 Sup. Ct. 37, 49 L. Ed. 214, Mr. Justice Brown said:

"In actions at law courts are bound by the literalism of the statute, but in equity the question of unreasonable delay within the statutory limitation is still open. * * * Even if the statute of limitations be made applicable in general terms to suits in equity, the defendant may avail himself of the laches of the complainant, notwithstanding the time fixed by the statute has not expired. * * * Indeed, in some cases the diligence required is measured by months rather than by years; and in others a delay of two, three, or four years has been held fatal."

The majority opinion seems to adopt the notion of the Circuit Court that this doctrine of laches has no special application here, as it does not appear that during the inaction of the complainant the mine had disclosed great increase in value by the discovery of rich ore. The rule of increased diligence exacted does not rest upon any such fact; but it is predicated of the peculiar character and incidents of such property, which is regarded as highly speculative. It rests upon the fact that a mining property which for days and months, and even years, may have been little productive or promising, may at any day, through the energy and money of the occupant, develop vast mineral wealth; that this expectancy and possibility, always to be indulged and anticipated, demands "that the claimant should be awake to his rights, prompt in their assertion, and eager in their pursuit." Reed v. Munn, 148 Fed., loc. cit. 760, 80 C. C. A. 238.

So it is said in the case of Patterson v. Hewitt, supra:

"There is no class of property more subject to sudden and violent fluctuations of value than mining lands. A location which to-day may have no salable value may in a month become worth its millions. Years may be spent in working such property apparently to no purpose, when suddenly a mass of rich ore may be discovered, from which an immense fortune may be realized. Under such circumstances, persons having claims to such property are bound to the utmost diligence in enforcing them, and there is no class of cases in which the doctrine of laches has been more relentlessly enforced."

Now, let us see what were the real underlying motives which influenced further delay in bringing this suit. On October 17, 1904, Fox wrote to Pettigrew reminding him that he had promised to come that way several times and failed; that had he come there would have been no need of the letter, as he had desired to see him and go over the ground. After stating that the actual purchase price was $40,-000, that Cunningham had paid $30,000, he said:

"Now, this is what I desire to say: That I expect to work at, and with the Iron Mine property until both your and my money is made good. There will be a car of ore here in about ten days taken from the Buzzard Claim. The returns I will send you when a settlement for the same is made. The mines are in process of patent."

The information that the mines were being worked, which was being done at Cunningham's expense, and that there was such development of the ore as to justify shipment, at once aroused the cupidity of Pettigrew, and turned his mind from his position of having repudiated the contract. Fox, as cunning as he is perfidious, a little later in another letter informed Pettigrew that he had been advised by a lawyer in Nevada that on account of some irregularity there was some question as to the validity of the original locations, and suggested that they make relocations and adverse any application by Cunningham for a patent, and thereby compel Cunningham to submit to their terms. As evidence of Fox's lawless character, he suggested in one of his letters to Pettigrew the advisability of taking forcible possession of the mines, boasting of the fact that in another transaction out there he had disobeyed an injunction of a court by a like lawless act. This was more than a purpose to enable Pettigrew to get back the money invested by him; it was also to enable Fox to exact from Cunningham any sum which he deemed demandable to satisfy his chronic hunger. With full knowledge of Fox's treachery and dishonesty, that he was making these suggestions while he was in the employ of Cunningham, Pettigrew with alacrity entered into this scheme. And Fox, with money furnished by Pettigrew, entered upon the work of relocations, and to cover up his tracks he took in, by overlapping boundary lines of some of the claims, additional ground and gave them different names. He bought in for Pettigrew a claimed outstanding title to the Buzzard mine (one of the group), and begun shipping ore therefrom; on the discovery of which Cunningham attached the consignment when it reached Salt Lake City. Then to conceal the presence of the discovered ore therein, he shot down earth over it.

Suspiciously enough, neither Pettigrew nor Fox produced, on request, the letter from Pettigrew in response to this suggestion of Fox, disclosing what the exact arrangement between them was. But enough

does appear from the correspondence to show that Pettigrew furnished the money to carry on this conspiracy, and sufficient to show that they were jointly interested in the result. In one letter Pettigrew wrote respecting the matter of shipping the ore, that he was unwilling to do so "unless there is a decided profit in it"; that he would sign a power of attorney authorizing Fox to file protest against the issuing of a patent, "and thus protect our interests against the patenting of those claims. * * * I will write Cunningham at any time you think I better do so." Again he wrote to his "Dear Friend Fox":

"I note what you say about the Battle Mountain mine, and that you have given an option on our interest for 25 per cent. This is all right. I think it is better for us to let it go, and look for something else."

The majority opinion undertakes to justify this double dealing and conduct of Pettigrew by making for him a case different from the one asserted in the bill, which was and is that Cunningham "became, ever since has been, and still is, a trustee of an undivided one-fourth interest of, in, and to said mining claims for your orator"; praying that Cunningham be decreed to make him a deed therefor. If this does not present the attitude of an assertion of an equitable co-tenancy in the proportion of three-fourths in Cunningham and one-fourth in Pettigrew, pleading is a useless formula. As such part equitable owner, seeking to enforce a lien on the entire property, his attempt clandestinely to acquire the entire title, to the ruin of Cunningham, was not only inconsistent with his attitude assumed in the bill, but was most unconscionable. The argument of the majority opinion to extenuate Pettigrew's conduct is quite different from that of the lawyer complainant and his astute counsel. On cross-examination of Pettigrew respecting his reasons and purpose for joining with Fox in so trying to obtain the whole title to the property, to the exclusion of Cunningham, he was pressed with the inquiry as to whether he intended thereby that Cunningham should lose the $30,000 he had invested in the property, or whether he intended, after he should get back the money he placed in it, to turn it back to Cunningham, he fenced and evaded direct answers, and finally took refuge under the position that his purpose was simply to protect himself by preventing Cunningham from obtaining a patent which would endanger his claim; and such was the argument of his counsel, both in his brief and orally before this court. And now when this contention, so flimsy as to discredit its sincerity, is exposed by the legal proposition that the obtaining of a patent could in no wise affect Pettigrew's claim and rights as an equitable co-tenant (Stevens v. Grand Central Mining Company, 133 Fed. 28, 67 C. C. A. 284), the majority opinion comes to their rescue by falling back on the bald proposition that "the complainant had a cause of action against the defendant for relief on the ground of fraud, *and nothing more*." (Italics mine.) If this be so, I again inquire, what business has the complainant on the equity side of the court? He does not seek by the bill to enforce any judgment that might be rendered for the recovery of the money advanced as an equitable charge or lien on the property. If the bill had so charged and sought such relief, the circuit court of Utah would have had no

jurisdiction to enforce such lien, for the palpable reason that the res—the real estate—is situate in the state of Nevada. The learned counsel who framed the bill of complaint recognized this fact, and therefore the case he presented for equitable relief was and is on the theory that Pettigrew is the equitable owner of a one-fourth undivided interest in the mine; and the prayer is that Cunningham be required by a decree of the court to convey by deed this one-fourth interest to Pettigrew—a decree that would operate in personam.

And, as hereinbefore shown, the chancellor, in decreeing a money judgment, and directing that it be secured by a mortgage on the mines, proceeded upon the notion that Pettigrew had an equitable interest in this property at the time of the decree. It, therefore, follows, inevitably, that the complainant cannot escape from the rigid application of the doctrine of laches as applied to mining property, nor can he escape from the imputation of appealing to a court of equity for relief with unclean hands, made so by a dishonest conspiracy with Fox to acquire the whole title to the property to the exclusion of Cunningham, and then appeal to a court of equity for protection as an equitable tenant in common with Cunningham in the very property he spent a year in an attempt, unconscionable as to Cunningham, to exclusively acquire.

The clear inference to my mind is that neither Pettigrew nor Fox, until this bill was filed, entertained the belief for one moment that Cunningham was personally liable to Pettigrew for the alleged fraud perpetrated upon him by Hyde. In no letter written by Fox to Pettigrew was it ever suggested that Cunningham was in any conspiracy to defraud Pettigrew, or that he had any notice of the claimed assurance by Hyde that Pettigrew was to pay one-half of the purchase money on the basis of what was to be paid to Johnston. But the whole gravamen of Fox's complaint about Cunningham was that he had not dealt fairly with him in respect of the option to him and Hyde to sell the property, and that he felt that Pettigrew should have back the $10,000 advanced by him.

If Pettigrew had assumed the attitude of a purchaser who elected to rescind the contract on discovery of the alleged fraud, leaving Hyde and Cunningham thereafter (as stated in the majority opinion) to work out their own devices respecting the property, and then after being advised that the property, under the development work done at the expense of Cunningham, was disclosing sufficient ore to justify its shipment, he undertook, by relocations and adversing the claims of Cunningham for a patent, in order, as he and his counsel claim, to protect his equitable one-fourth interest, common justice and fairness demand at most that he should now be compelled to accept from the defendant a quitclaim deed therefor, which counsel in open court on this hearing offered to do (as a choice of two evils or burdens), and that he should not be preferred to have a money judgment for the recovery of the $10,000 advanced by him with interest thereon from the date it was paid, secured by mortgage. His declinature to accept this proposition leaves no doubt in my mind that he was more than content with his money judgment, because of his discovery that the mining property ultimately proved to be comparatively worthless.

As if to still further favor Pettigrew and punish Cunningham, the majority opinion imposes upon Cunningham the burden of nine-tenths of the costs of this appeal. The sum awarded Pettigrew by the decree of the Circuit Court was concededly excessive by $1,457.77. While the appeal was from the whole decree, the record of the evidence in equity was a unit and indivisible. Therefore, to obtain relief from the excessive decree, Cunningham had to bring up the whole record, because the facts relied upon were so interlaced as to make them inseparable. To the last syllable of the argument before this court, counsel for the appellee insisted upon his right to maintain the decree in its entirety. As applied to such situation, it seems to me that no part of said costs should be taxed against the appellant.

The decree should be reversed.