John A. Bishop, Plaintiff in Error, vs. Charles E. Taylor, Defendant in Error.

1. Motions for new trials are addressed to the sound judicial discretion of trial courts, and where such courts grant motions

Bishop v. Taylor.— Syllabus.

of this character, their decisions are presumed to be in accordance with the justice and merits of the cause unless the contrary appears by the record; and an order granting a new trial should not be disturbed by an appellate court unless it appears affirmatively from the record that there has been an abuse of a sound judicial discretion, or that some settled principal of law has been violated.

2. Where the burden of proof is upon a plaintiff, and the evidence before the jury is legally insufficient to support a verdict in his favor and the jury find a verdict for defendant, the trial court is not justified in setting aside such verdict upon the ground that it is contrary to the evidence and the weight of evidence.

3. Where the record shows that a bill of exceptions was presented to the Circuit Judge for settlement on a certain day; that he declined to settle and sign it on that day because there were some "inaccuracies" in same; that it was signed on a subsequent day; and the bill as signed purports to give in full the direct and cross-examination of witnesses, the evidence which plaintiff and defendant introduced to maintain the issues on their respective parts states that "plaintiff rested his case" at the conclusion of certain testimony and purports to give the testimony of plaintiff in rebuttal, the appellate court will assume that the bill of exceptions contains all the evidence adduced at the trial.

4. A count for money had and received may be proved by any legal evidence showing that defendant has possession of the money of plaintiff which in equity and good conscience he ought to pay over, but plaintiff can not recover upon such a count unless he proves title to the fund sought to be recovered.

5. In an action for money had and received any evidence is admissible on behalf of defendant which tends to show that he in good faith received the fund sought to be recovered as money due to himself and not to the plaintiff.

6. Where evidence is received without objection, and no motion to strike it out is made, the reception of such evidence constitutes no ground for granting a new trial.

Writ of error to the Circuit Court for Marion county.

*Statement.*

·The defendant in error began an action of assumpsit against the plaintiff in error, in the Circuit Court of Marion county, the declaration filed December 5, 1892, containing only common counts for money received, money lent and accounts stated, in the sum of $2,000. The defendant filed his plea "never was indebted," and issue being joined thereon, the cause was tried before a jury on October 11, 1893, resulting in a verdict for defendant. Thereupon plaintiff filed his motion to set aside the verdict and grant a new trial upon the following grounds, *viz*:

"1st. The verdict of the jury is contrary to the evidence and the weight of evidence.

2nd. Also that the court erred in admitting evidence of defendant to show another and different contract which was inadmissible under the pleadings.

3rd. Also upon additional ground that the court erred in allowing evidence to be introduced in relation to the drawing of checks for money paid by defendant to L. M. Thayer and the plaintiff, which evidence was incompetent and tended to prejudice the minds of the jury."

On October 21, 1893, the court granted the motion and the defendant sued out this writ of error, to review that ruling. The first error assigned and the only one considered is that "The court erred in granting the plaintiff's motion to set aside the verdict of the jury and grant a new trial."

The plaintiff's evidence in chief was as follows:

Charles E. Taylor—"I am the plaintiff. I know the defendant and have known him many years. The defendant is indebted to me in the sum of $2,000 and interest for an agreement between us. In 1891, in June

I think it was, Mr. Bishop was in Ocala getting up phosphate land to sell the French Company. One day I was talking with Capt. L. M. Thayer, the general manager of the Peninsular Phosphate Company, on the front porch of the Ocala House. We saw Mr. Bishop pass and I suggested to Capt. Thayer to sell him his company. Capt. Thayer said that if I would introduce him to Mr. Bishop and the company was sold he would pay me a commission of $5,000 if it sold for $125,000; and I said, if you do I will give you half. Capt. Thayer did not know Bishop. We went to Mr. Bishop's room in the Ocala House. He was lying on the bed. I introduced Capt. Thayer as the manager of the Peninsular Company, and he asked Bishop if he wanted its property. Mr. Bishop asked the price. Capt. Thayer asked Bishop if he expected a commission, and Mr. Bishop answered no, that he got his commission from the other side. Then Capt. Thayer said the price of the Peninsular Company was $125,000. A few days after I met Mr. Bishop and I said to him, 'you are a good friend of mine. I will be busy and not have time; run this through for me and I will give you $500.' Later on I made up my mind I would give him $1,000, because I thought Bishop was going to take advantage of my confidence in him. On November 12, 1891, Bishop paid $2,000; $1,000 to Capt. Thayer and $1,000 to me, by check. That leaves a balance of $2,000, which is the amount I sue for in this case. Bishop received $5,000 from the Peninsular Phosphate Company. Cross-examination: I don't know whether commission was paid by the company to Bishop for my account. We made our agreement on the street of the public square in Ocala. Nobody was present. Don't remember whether it was on the west side or north side; it was one side or the other; don't remember

which; was not on Ocala House porch. The $2,000 was paid in two checks. Was not to either my order or to Capt. Thayer's order. The checks were drawn to order of Mr. Bishop and endorsed by him and delivered to us. The checks were drawn in that way and not to order for private reasons. I never instructed the Peninsular Company to pay Mr. Bishop this commission for me. I never demanded the commission from the company. Don't believe they knew I was to get a commission. Q. What did you do to earn this commission? Ans. I was to receive this commission for introducing Capt. Thayer to Mr. Bishop, and also for getting Capt. Thayer to write. Bishop a letter offering to give Bishop $5,000 to refuse to buy the company under the contract."

Richard McConathy—"I was secretary and treasurer of the Peninsular Phosphate Company. The company sold its property to John A. Bishop for $125,000, but a commission was paid to him of $5,000. The $5,000 was paid to Bishop in two amounts; $2,500 by check when first money was paid in November, 1891, and the other $2,500 credited on Mr. Bishop's note due the company in May, 1892. Cross-examination: The company did not pay this money to Mr. Bishop for Mr. Taylor. We did not know Mr. Taylor in the transaction. I don't remember the exact time I first learned that a commission was to be paid, but it was some time after our first contract with Mr. Bishop. The first time I learned of the commission was when Capt. Thayer came to my office and informed me that a commission was to be paid to Bishop. Think Mr. Bishop and Mr. Anthony were present. I was surprised to learn that a commission was to be paid, as nothing had ever been said about a commission. I always thought there was something wrong. We did not know anybody else in the matter but Bishop.

6

The company did not know Mr. Taylor was interested in the $5,000. Capt. Thayer did not tell us that he promised Mr. Taylor a commission, but said that it did not make any difference who got it, as the company was getting a good price."

L. M. Thayer—"I was the general manager of the Peninsular Phosphate Company. I know the plaintiff and defendant. I promised Mr. Taylor a commission of $5,000 if he would sell our company. He went to Mr. Bishop's room in the Ocala House. Taylor introduced me to Bishop. I asked Mr. Bishop if he wanted to buy the company, and he asked me the price. I asked him if he expected a commission and Mr. Bishop answered that he got his commission out of the French Company. Then I told him the price was $125,000. Mr. Bishop said he would contract with the company; if it proved satisfactory would take it. When I left Mr. Bishop, I came direct to the office of Judge McConathy in the court house and told him that I had sold the company for $125,000. Afterwards I told the directors I could sell for $125.000; $5,000 commission, but did not tell whom the commission was to be paid. We entered into a contract with Mr. Bishop that day or the next day, don't remember which. Afterwards the company sold its property to Mr. Bishop for $125,000, but me and Mr. Bishop were to share the expenses of examining the property, but he has never paid his share. The company never agreed to pay any commission to Mr. Bishop. Mr. Taylor informed me that he had arranged with Mr. Bishop to collect his commission. Cross-examination: I had authority to sell the company and was to pay a commission. I agreed to pay Mr. Taylor $5,000 for selling the company. Mr. Taylor told me that he had arranged with Mr. Bishop to collect

for him the $5,000. Nobody was present when he told me. I was not told in Mr. Bishop's presence. Mr. Bishop never told me that he was collecting for Taylor. I never talked with Bishop about it. I never heard anything about the $500 Taylor promised to give Bishop for collecting the commission, except what Taylor told me, nor about increasing it to $1,000, except what Taylor told me. As Mr. Taylor testified, I was interested in the $5,000 commission. He agreed to give me half. I received from Mr. Bishop, about the time of the second payment to the company, $1,000. The same was paid by check. It was not made payable to my order. It was made to the order of Mr. Bishop, and he endorsed it and gave it to me. It was drawn so for private reasons. The private reason was I did not want to be known in the transaction. Mr. Taylor later in the same day received $1,000 from Mr. Bishop. Was not present. Nothing was said at the time about any balance except the $1,000 to be paid to Taylor."

The defendant's evidence was as follows:

John A. Bishop—"I never at any time agreed with Mr. Taylor to collect any commission for him or to pay him any commission whatever. Part of what Mr. Taylor and Mr. Thayer have stated is true, but they didn't tell it all. The circumstances are these: About the first of August, as near as I can recollect, Mr. Thayer and Mr. Taylor came to my room at the Ocala House, and Mr. Thayer asked me if I did not want to buy the Peninsular Phosphate Company's property. After some statements by Mr. Thayer as to the condition and amount of phosphate on its property, I asked him what price the company wanted for its property. He asked me if I wanted a price to include a commission for myself or not. I answered that I wanted the lowest price; that I neither

paid any commission, nor did I expect any; that I would get my commission from other parties. He then informed me that the company wanted $125,000 for its property. I agreed to contract with them and examine the property, provided they would furnish hands to do the pitting under the direction of our expert examiner, which he agreed to do. That day or the next, as near as I remember, in the office of the company, Judge McConathy, who drew the contract between the company and myself, we entered into a contract and proceeded to examine the property. Later, about the first of September, 1891, I informed the company that I would take the property and to get their deeds and abstracts ready for examination. A day or two after I had agreed to take the property, Capt. Thayer met me on the street by the south gate to the court house yard and said: 'Bishop, I think you ought to pay me something for my assistance to you in the contract.' I said to him: 'Capt. Thayer, you know that I told you that I neither paid or expected any commission, and I can't see where you have been of benefit to me, as you acted for the company.' Q., by plaintiff's counsel: 'Was Mr. Taylor present at this conversation?' Ans. 'No.' Thereupon counsel for plaintiff objects to the evidence upon the ground that same is inadmissible against plaintiff and not binding on him; which objection was overruled and plaintiff excepts. Plaintiff's counsel objects to evidence of witness upon further ground that the attempt to introduce and establish a new contract to which plaintiff was not a party and that was not pleaded, and therefore such evidence was immaterial and improper. Objection overruled. Plaintiff excepts. I remarked that I was paying a big price for the company, and that unless he could do something that would save me some money I did not see why I

should give him any. I said, 'If you can get the company to reduce the price of the land, I would be willing to pay you some part of whatever you saved me.' After thinking awhile he said that he thought that he could get the company to allow me $5,000 as a commission or rebate. I then told him that he could agree to have them allow me the $5,000 commission and so report it to the company, and if the company allowed it I would pay him $2,000 of the same. He said he would do it. I said 'the sooner the better, and if they object you can tell them that I will not take the property without.' He said 'come, and I will tell Judge McConathy now,' and we went to Judge McConathy's office and he said to Judge McConathy that it is understood and agreed between Mr. Bishop and myself and I promised him that I would pay and he get $5,000 as a commission on the sale of the company's property. Judge McConathy asked me if that was the understanding and I answered that Capt. Thayer had promised me to get the company to allow me $5,000. Judge McConathy seemed very much surprised. That was all the commission I promised to pay anybody. The company subsequently paid me $5,000 as commission on Capt. Thayer's statement. I paid Capt. Thayer as I agreed to do $2,000 on or about the 12th day of November, 1891, and at Capt. Thayer's request and order I paid $1,000 of the $2,000 to Mr. Taylor and the other $1,000 I paid to Capt. Thayer in person. So by the transaction I saved myself $3,000. It is evident to you, gentlemen of the jury, that Capt. Thayer, after getting $2,000, seeing that I had made $3,000, became dissatisfied after he got his money and spent it, and thinking that the circumstances surrounding the transaction were such that he could force me to pay another $2,000, but knowing that he could not bring

the suit himself and collect, he now seeks to collect through his friend who is to get half. I never had any agreement with Mr. Taylor as he testified. I never agreed to collect any money for him. I never had any conversation with Mr. Taylor about any commission until I paid him the $1,000 at Capt. Thayer's request. I paid Capt. Thayer $2,000 in two checks of $1,000 each. (Witness shown checks.) These are the checks. One of the checks was drawn by H. A. Bishop, my brother, the first, that was given to Capt. Thayer. He came to my office and asked me for the money. I asked my brother to draw him a check for $2,000, and then Capt. Thayer said no, to pay him $1,000, and to pay the other $1,000 to Mr. Taylor when he came. He asked if I wouldn't draw the checks payable to myself, as he did not want to be known in the transaction. We discussed how it could be done, and that is how the checks were drawn in that way. Later Mr. E. W. Agnew, president of the First National Bank of Ocala, came to me and said there were two checks for a thousand dollars presented at the bank for payment and that he had refused to pay them until he had seen me, as he considered it something unusual; that he didn't understand it; that it looked queer. I stated to him that they were for commission to Capt. Thayer, and that he did not want to be known. In regard to the letter mentioned by Mr. Taylor, I never knew until now that Mr. Taylor had any knowledge of that letter. Mr. Thayer did write me a letter, or such a letter, offering me in the name of the company $5,000 to let them withdraw from their contract with me. Whether the company ever authorized him to write such a letter or not I don't know. A few days prior to the date of the letter received from Capt. Thayer making that proposition, which was about the

time of our finishing our examination of the property, Capt. Thayer asked me if the French people were satisfied with the lands. I informed him that he had stated to me that the lands of the company did contain not less than 600 acres of mining land, and that the company estimated that they had about 5,000,000 tons of phosphate of a high grade; that so far the examination of the lands only showed something less than 200 acres of mining land and less than 1,000,000 tons of phosphate, and that naturally they felt disappointed at so little when so much had been promised. He remarked that he did not believe such a report, and that the company was very much astonished at the developments, and that if they had known they had such good property they would not have contracted to sell at that price. I remarked that the company would probably have an opportunity to sell to somebody else. A few days after I received this letter submitting the proposition. That is all I know about the writing of the letter. I never had any conversation on the streets of Ocala or elsewhere with Mr. Taylor about any commissions. When Mr. Taylor got the check from me he did not say anything about any balance. I had only a slight acquaintance with Mr. Taylor—barely knew him, and was only on speaking terms—never having had any business transactions with him. Cross-examination: I never had any agreement with Mr. Taylor. I did receive $5,000 from the Peninsular Company. I paid $1,000 to Mr. Taylor because Mr. Thayer requested me to. I paid the $2,000 because I promised to. The reason Mr. Thayer got only $2,000 and I $3,000, was because I took the lion's share."

Samuel P. Anthony—"I was the vice-president of the Peninsular Phosphate Company. The company sold its property to John A. Bishop for $125,000, and agreed to

pay him a commission of $5,000. The company never agreed to pay Taylor any commission. Capt. Thayer never had any authority to promise anybody a commission. The first time I heard about the commission was in McConathy's office. Thayer said that $5,000 was to be paid to Bishop. I had understood that none was to be paid and asked who was to get it, and Thayer said to pay it to Bishop and not to say anything about who was to get it; that it didn't make any difference who was to get it. When the last payment was made to the company Mr. Bishop brought a suit against the company and tied up the money in bank; and in conversation with Mr. Bishop about the $5,000 he informed me that he had paid Capt. Thayer $2,000 of it. Capt. Thayer told me later, on the corner over there (pointing), that Bishop was to pay him $2,000 and Taylor $2,000. Bishop never told me that he agreed to pay Thayer $2,000 and Taylor $2,000."

Herbert A. Bishop—"I am the brother of the defendant. I was present in my brother's office on November 12, 1891, when Capt. Thayer called and got a check for $1,000. (Witness shown checks identified by defendant.) This (indicating one) was filled out by me. Capt. Thayer said that he did not want to be known in the matter, and requested the check drawn to my brother's order, which was done, and my brother endorsed it and gave it to Thayer. Nothing was said by Thayer about any balance."

The two checks were here received in evidence without objection. They were each dated "Ocala, Fla., Nov. 12, 1891," signed by John A. Bishop, addressed to "First National Bank," each for $1,000; one payable to the "order of John A. Bishop or order," the other "to the order of self;" each was endorsed "John A. Bishop," and

stamped on back "First National Bank, Ocala, Florida. Paid Nov. 12, 1891."

E. W. Agnew—"I am president of the First National Bank of Ocala. (Witness shown checks in evidence.) I saw this before, when they were presented for payment. I refused to pay them until I could ask Mr. Bishop about them, and he said that they were all right; that they were for commission to Mr. Thayer, who did not want to be known."

Plaintiff's evidence in rebuttal was as follows:

L. M. Thayer—"I told McConathy that a commission of $5,000 was to be paid to Mr. Bishop. Later I told McConathy that Taylor had made arrangements with Bishop to collect commission. I deny what Mr. Bishop has testified as to any understanding between us."

Other facts are stated in the opinion.

*J. H. Burchell,* for Plaintiff in Error.

*No Appearance* for Defendant in Error.

CARTER, J.:

The writ of error is from an order granting a new trial and is authorized by section 1267, Revised Statutes, which reads as follows: "Upon the entry of an order granting a new trial at law, the party aggrieved by such order may, without waiting for a final judgment in the cause, prosecute a writ of error to the proper appellate court, which shall review the said order, and if the cause be reversed, shall direct final judgment to be entered in the court below, for the party who had obtained the verdict in the court below, unless a motion in arrest of judgment or for judgment *non obstante vere-*

*dicto* shall be made and prevail." In passing upon the propriety of this order under the first assignment of error we shall consider each ground of the motion for the new trial in the order stated in such motion.

I. There is nothing in the evidence tending to prove a cause of action under the counts for money lent, and account stated. Nor do we see anything in the evidence which could have justified a verdict for plaintiff upon the count for money received. The defendant pleaded the general issue which placed the burden of proof upon the plaintiff, and in the absence of evidence which if true would have sustained a verdict for plaintiff, the jury were not only authorized, but imperatively required by law, to find for the defendant. It is true that motions for new trials are addressed to the sound judicial discretion of trial courts, and that where such courts grant motions of this character, their decisions are presumed to be in accordance with the justice and merits of the case, unless the contrary appears by the record, and that an order of the trial court granting a new trial should not be disturbed by an appellate court, unless it appears affirmatively from the record that there has been an abuse of a sound judicial discretion, or that some settled principle of law has been violated. Reddick v. Joseph, 35 Fla. 65, 16 South. Rep. 781. But where the burden of proof is upon a plaintiff, and the evidence before the jury is legally insufficient to support a verdict in his favor, and the jury find a verdict for the refendant, the trial court is not justified in setting aside the verdict upon the ground that it is contrary to the evidence and the weight of evidence. Such a ruling not only shows a clear abuse of discretion, but violates settled principles of law.

There are some expressions in the testimony of John

A. Bishop which would seem to indicate that Taylor had testified to some agreement between them not shown by the report of Taylor's testimony, but the bill of exceptions purports to give in full the direct and cross-examination of the witnesses, the evidence which the plaintiff and defendant introduced to maintain the issues on their respective parts; it states that plaintiff "rested his case" at the conclusion of the testimony of L. M. Thayer, and purports to give the testimony of plaintiff in rebuttal. In addition to these facts it appears from a statement of the judge, endorsed on the bill of exceptions, that it was presented to him for settlement on January 1, 1894, and was objected to by plaintiff as inaccurate and incomplete, and "as there are some inaccuracies, the same is not settled today." On the following day the judge signed it, and it does not purport to be partial or incomplete. With these facts before us we must assume that the bill contains the whole evidence adduced at the trial. Robinson v. Hartridge, 13 Fla. 501.

In Gordon v. Camp, 2 Fla. 422, it is said that a count for money had and received may be proved by any legal evidence showing that the defendant has possession of the money of the plaintiff, which in equity and good conscience he ought to pay over. It was therefore necessary that plaintiff should in this case prove title to the fund sought to be recovered, and that in equity and good conscience defendant ought to pay same over to him. 2 Chitty on Contracts, pp. 898-908. The evidence did show that Thayer promised plaintiff $5,000 commission on the sale made to Bishop, and that he and plaintiff were to divide this commission between them. It also showed that Bishop received from Thayer's company a commission of $5,000, although by the original agree-

ment he was to receive none; and that he paid Thayer and plaintiff $1,000 each of the sum received by him as such commission; but there is no evidence that the commission actually paid to Bishop was the identical commission that plaintiff had been promised by Thayer. There is no evidence that Bishop ever knew that Thayer had promised plaintiff a commission, or that he had ever agreed to collect a commission for plaintiff, or that the $5,000 was paid to him for plaintiff, or that when he received it he knew or supposed that it belonged to plaintiff. It is true that Thayer testified that Taylor told him he had arranged with Bishop to collect his commission, but that was mere hearsay; and although Taylor was himself a witness he testified to no such arrangement. He says in a general way "the defendant is indebted to me in the sum of $2,000 and interest, for an agreement between us," but the nature of that agreement is not stated and we can not know that the supposed agreement would sustain a common count for money received, or that it related to the $5,000 commission. He also says that a few days after his introduction of Bishop to Thayer "I met Mr. Bishop and I said to him 'you are a good friend of mine. I will be busy and not have time; run this through for me and I will give you $500;'" but it nowhere appears what was meant by "run this through for me," or that it had the slightest reference to the commission transaction, or that Bishop then knew that plaintiff was to get a commission, or that he assented to plaintiff's request to "run this through." He also says he afterwards made up his mind to give $1,000 instead of $500, but this mental state does not appear to have ever been known to Bishop. The Peninsular Company never knew that Taylor was to get a commission, and they paid the commission to Bishop, not for Taylor, but for

himself upon Thayer's statement that he had promised it to him and that it made no difference who got it. Thayer, it is true, denies Bishop's statement as to the understanding between them that the $5,000 was to be paid Bishop as a commission and he was to give Thayer $2,000 of it. If this testimony of Bishop's be entirely eliminated, it will still appear that though Bishop originally was to receive no commission, yet that subsequently the Peninsular Company did pay him $5,000 as a commission to himself upon Thayer's statement that he was entitled to it, and that Bishop thereupon at Thayer's request paid him $1,000 and plaintiff $1,000 of the amount, and there will still be no testimony to show that the commission received by Bishop was the commission promised by Thayer to plaintiff. Without stopping to point out other deficiencies in the evidence, we think that upon no view of it could a verdict have been properly found for plaintiff, and that therefore the new trial could not legally have been granted upon the first ground of the motion.

II. The evidence complained of by the second ground of the motion for a new trial was evidently the testimony of Bishop to which an objection was interposed and overruled, as will be seen by reference to the statement of facts. This testimony was properly admitted, as bearing upon the material question as to whether defendant received the $5,000 commissions as money due to himself, or for the use of the plaintiff. Although by the original agreement for the purchase of the Peninsular Phosphate Company property Bishop was not entitled to a commission, yet if the company afterwards allowed and paid him one, he had a perfect right to receive it. There was nothing in the evidence showing any relation between him and plaintiff or Thayer which

debarred him from accepting a commission if Thayer or the company was willing to pay it. And if he received the commission for himself and Thayer under an agreement with Thayer, having no knowledge that plaintiff was entitled to it, he can not be said to have received it for the use of plaintiff. There was, therefore, nothing in the second ground of the motion to authorize a new trial.

III. The evidence referred to in the third ground of the motion was all received without objection, and its admission under those circumstances constitutes no ground for a new trial.

The order granting the new trial is reversed, with directions to the Circuit Court to enter final judgment for defendant upon the verdict, unless a motion in arrest of judgment, or for judgment *non obstante veredicto* shall be made and prevail.