HOLMAN WILLIS, *Appellant*, vs. MRS. M. C. FOWLER, a free dealer, CODY FOWLER, FOWLER PROPERTIES, INC., and ELIZABETH COURT, INC., *Appellees*.

136 So. 358.

En Banc.

Opinion filed June 17, 1931.

Petition for rehearing denied July 29, 1931.

38

*Henry E. Williams* and *C. W. Lawrence, Jr.*, Attorneys for Appellant;

*Macfarlane, Pettingill, Macfarlane & Fowler*, Attorneys for the Appellees.

BROWN, J.—On November 19, 1926, Holman Willis, of Roanoke, Virginia, filed a bill of complaint in the Circuit Court of Hillsborough County against Mrs. M. C. Fowler, a free dealer, and certain other defendants, to rescind a contract made by him with Mrs. Fowler and to recover from the defendant, Mrs. Fowler, $6,666.67 alleged to have been paid by him to her on said contract, upon the ground that he was induced to enter into said contract by certain fraudulent and material misrepresentations. The bill also prayed that the court set aside various conveyances alleged to have been made by the defendant, Mrs. Fowler, to the other three defendants, affecting property other than that which was involved in the contract sought to be rescinded, upon the ground that said conveyances were fraudulent as against the complainant and the other creditors of the defendant Mrs. Fowler. At the time the bill was filed a notice of *lis*

*pendens* was filed embracing all the property described as having been fraudulently conveyed.

The transaction upon which the prayer for rescission of contract, and for a money decree for the amount paid thereon, was founded, is set forth in the bill as follows:

"That prior to and at the time of the acts and things herein complained of, the defendant, Mrs. M. C. Fowler, was a licensed real estate agent with principal office at Tampa, Florida, and held herself out and dealt as such; that during all of said time and for several years prior thereto, defendant, Mrs. M. C. Fowler, was engaged in large real estate transactions on her own account and on account of various corporations principally owned and controlled by her and on behalf of divers other persons.

"That on or about the 15th day of June, 1925, the defendant, Mrs. M. C. Fowler, as an inducement to the purchase in this bill complained of, represented to your orator that a syndicate of individuals, designated by her as the Warren-Leach Syndicate, had agreed to purchase One Hundred Four Thousand (104,000) acres of land from the Central Florida Lumber Company and that the Syndicate held a written contract of purchase of said land, upon which the Syndicate had paid Twenty-Five Thousand Dollars ($25,000.00); that the interest in said land under said contract arising from the Twenty-Five Thousand Dollars ($25,000.00) so paid was divided into ten (10) shares of participation, or interests, of Twenty-Five Hundred Dollars ($2500.00) each; that certain Jews owning three (3) of these one-tenth (1/10) interests, for which they had paid Seventy-Five Hundred Dollars ($7500.00), were willing to sell their three (3) one-tenth (1/10) interests for Twenty Thousand Dollars ($20,000.00), and that she and one Douglas Conley, another large real estate operator, were each taking one (1) of the said three (3) one-tenth (1/10) interests at Sixty-Six Hundred Sixty-Six Dollars and Sixty-Six Cents ($6,666.66) each, and requested your orator to take the other remaining one-tenth (1/10) interest of the said three (3) one-tenth (1/10) interests at Sixty-Six Hundred Sixty-Six Dollars and Sixty-Six Cents ($6,666.66). Whereupon your orator advised the defendant, Mrs. M. C. Fowler, that he knew nothing about the matter but

that he was willing to purchase the aforesaid one-tenth (1/10) interest as requested by her if he was purchasing same on exactly the same basis that she and Conley were each purchasing one (1) of the remaining two (2) one-tenth (1/10) interests and if your orator was paying the same that the defendant, Mrs. M. C. Fowler, and the aforesaid Douglas Conley were each paying for a one-tenth (1/10) interest. Whereupon the defendant, Mrs. M. C. Fowler, positively assured your orator that he was purchasing on exactly the same basis that she and Conley were each purchasing and that your orator was paying the same that each of them was paying.

' "Your orator further avers that at the time of aforesaid transaction he knew the defendant, Mrs. M. C. Fowler, was a prominent dealer, of large experience, in real estate in Florida and your orator advised the defendant, Mrs. M. C. Fowler, that he knew nothing about the value of the said interest which she requested he purchase with she and Conley, and your orator further advised the defendant, Mrs. M. C. Fowler, that he was relying absolutely on her judgment and would not purchase unless he was paying exactly what she and the said Conley were each paying. Whereupon, the defendant, Mrs. M. C. Fowler, again assured your orator that she and Conley were paying exactly what your orator was paying. Thereupon your orator agreed to purchase at and for the sum of Sixty-Six Hundred Sixty-Six Dollars and Sixty-Seven Cents ($6,666.67) one of said three (3) one-tenth (1/10) interests upon the understanding and agreement with the defendant, Mrs. M. C. Fowler, that she and said Douglas Conley were each purchasing one (1) of said three (3) one-tenth (1/10) interests at and for the sum of Sixty-Six Hundred Sixty-Six Dollars and Sixty-Six Cents ($6,666.66). Whereupon your orator drew and delivered to the defendant, Mrs. M. C. Fowler, a draft for said sum of Sixty-Six Hundred Sixty-Six Dollars and Sixty-Seven Cents ($6,-666.67) to be used by her in payment for his one (1) one-tenth (1/10) interest so purchased by him, which said draft was in due course paid to the order of the defendant, Mrs. M. C. Fowler.

"Your orator avers that the aforesaid representations by the defendant, Mrs. M. C. Fowler, that certain persons

owning three (3) of said one-tenth (1/10) interests, for which they had paid Seventy-Five Hundred Dollars ($7500.00), were willing to sell their three (3) one-tenth (1/10) interests for Twenty Thousand Dollars ($20,-000.00), were false and fraudulent, were intended to and did deceive your orator, and were intended to and did induce your orator to make the aforesaid purchase. Your orator further avers that the representations of the defendant, Mrs. M. C. Fowler, that she and one Douglas Conley were each taking one (1) of the three (3) one-tenth (1/10) interests at Sixty-Six Hundred Sixty-Six Dollars and Sixty-Six Cents ($6,666.66) each, were false and fraudulent representations, were intended to and did deceive your orator, to his injury, and were intended to and did induce your orator to make the aforesaid purchase. Your orator avers that the representation of the defendant, Mrs. M. C. Fowler, that your orator was purchasing on the same basis that she and Conley were purchasing, was a false and fraudulent representation which was intended to and did deceive your orator and which was intended to and did induce your orator to make the aforesaid purchase. Your orator avers that the representation of the defendant, Mrs. M. C. Fowler, that your orator was paying the same that she and Conley were each paying, was a false and fraudulent representation, was intended to and did deceive your orator, to his injury, and was intended to and did induce your orator to make the aforesaid purchase. Your orator avers that the assurance and representation of the defendant, Mrs. M. C. Fowler, that she and said Conley were paying exactly what your orator was paying, was a false and fraudulent representation and assurance which was intended to and did deceive your orator, to his injury, and which was intended to and did induce your orator to make the aforesaid purchase.

"Your orator avers that at the time of his aforesaid purchase and at the time of aforesaid representations and assurances, the defendant, Mrs. M. C. Fowler, was the owner of each of aforesaid three (3) one-tenth (1/10) interests formerly owned by said Jews; that said Jews had, prior to the aforesaid representations and assurances inducing the purchase herein complained of, sold the said three (3) one-tenth (1/10) interests to aforesaid

Douglas Conley, who had, prior to said representations and assurances, agreed to sell said three (3) one-tenth (1/10) interests to the defendant, Mrs. M. C. Fowler. Your orator avers that said Jews received, in payment for the said three (3) one-tenth (1/10) interests, the sum of Seventy-Five Hundred Dollars ($7500.00) and no more.

"Your orator avers that the aforesaid sum of Sixty-Six Hundred Sixty-Six Dollars and Sixty Seven Cents ($6,666.67) was obtained from him by the defendant, Mrs. M. C. Fowler, by false and fraudulent pretenses.

"Your orator avers that promptly upon learning of the aforesaid fraud your orator offered to the defendant, Mrs. M. C. Fowler, to rescind such purchase and return all considerations received by him, and demanded a return of said sum of Sixty-Six Hundred Sixty-Six Dollars and Sixty-Seven Cents ($6,666.67). Whereupon the defendant, Mrs. M. C. Fowler, refused to return to your orator said moneys, and your orator now offers to do equity."

The bill then sets forth certain facts with regard to the organization of the two defendant corporations and the conveyance of certain properties by the defendant, Mrs. Fowler, either directly or indirectly to them and the individual defendant named, for the purpose of hindering, delaying and defrauding the creditors of the defendant, Mrs. Fowler, and especially the complainant, and that they took title knowing the fraudulent purpose and the character thereof. The bill also alleged that the defendant, Mrs. Fowler, had transferred to said other individual defendant certain shares of stock owned by her in one of said corporate defendants, with like fraudulent purpose. That at the time of making these conveyances and transfers, Mrs. Fowler was insolvent.

The bill prayed that complainant's aforesaid purchase, therein complained of, be rescinded, and that complainant "do have and recover a decree against the defendant, Mrs. M. C. Fowler, for the amount due him as herein shown, principal and interest, and for the cost of this suit", and

that the said conveyances and transfers of property be declared null and void as against the complainant.

The defendants filed joint and several exceptions to those portions of the bill of complaint relating to the alleged fraudulent conveyances and transfers of property, and a petition to remove and vacate the *lis pendens*. Said exceptions were sustained by the court and the petition to vacate and cancel the *lis pendens* was granted.

The defendants then filed their joint and several demurrer to the bill of complaint upon several grounds hereinafter discussed, which demurrer was sustained by the court and complainant's bill dismissed. From this order, as well as from the orders sustaining the exceptions to the bill of complaint and cancelling the *lis pendens*, this appeal was taken.

We have made this rather meticulous statement of the case on account of the somewhat close and important character of the questions raised by the exceptions and demurrer.

The bill has a two-fold aspect. It is (1) a bill to rescind a contract on the ground of fraud and to recover the money paid thereon, and (2) it also seeks, in the nature of a creditor's bill, to set aside alleged fraudulent conveyances.

We will first consider the questions raised by the demurrer, to the effect that the bill, as regards its first aspect above mentioned, was without equity, and that the complainant, if he had any cause of action whatever, had an adequate remedy at law, and that therefore the equity court was without jurisdiction. If these contentions be sound, it would be unnecessary to consider the questions concerning the second aspect of the bill.

Appellant contends that equity had jurisdiction under the facts alleged in the bill on the ground that where a contract is shown to have been procured by false and fraudulent misrepresentations concerning material facts, resulting in injury to complainant, equity will decree a rescission

and cancellation; citing Riverside Investment Co. v. Gibson, 67 Fla. 130, 64 So. 439; International Realty Associates v. McAdoo, 87 Fla. 1, 99 So. 117. Both of these cases involved written contracts.

Appellees say in reply to this that equity will only decree the rescission or cancellation of written contracts; that they have not been able to find a case where equity has ever applied this remedy to mere oral agreements; and that as the bill does not allege that the contract sought to be rescinded was in writing, no equity is shown.

Although no case has been cited to this court wherein rescission of a parol contract was granted by a court of equity, we have no doubt of the jurisdiction of such a court to grant such relief in proper cases, where the usual grounds necessary to be shown to entitle a party to rescission are made to appear and the contract is not illegal and void, on account of being contrary to statute or public policy. Of course, equity will not ordinarily intervene to cancel and declare void a contract which is not merely voidable but is null and void. Black on Rescission and Cancellation, 2nd ed., sections 3, 4, 318-651. Some courts, in cases to remove clouds, have made an exception to this rule in the matter of cancelling an instrument of title, even though the instrument be void on its face, or can be shown to be so by extrinsic evidence. Such relief is expressly authorized under our statute regarding the quieting of title. Section 5005 C. G. L. See also 12 L. R. A. N. S. 49, 4 R. C. L. 497; Black *supra*, 16, 318.

Rescission and cancellation in equity usually go together, but at least so far as the physical cancellation of the instrument involved is concerned, they are not inseparable. While a decree for rescission alone might amount to a judicial annulment of the contract, perhaps, in its strictest sense, cancellation would apply only to written instruments, which the court requires to be surrendered and actually cancelled, or the public record thereof cancelled, in order to prevent

such deeds, agreements, notes, securities, or other instruments, from being vexatiously or injuriously used against the party seeking relief, when the evidence to impeach them may be lost. 4 R. C. L. 486, 497. Thus, also, there may be a decree for the cancellation of the public record of a land contract, without a decree of rescission by the court, the contract having already been terminated or cancelled as between the parties in accordance with its terms, and the record thereof being ordered cancelled by the court as a cloud on complainant's title. Realty Securities Co. vs. Johnson, 111 So. 532, 93 Fla. 46; Chubb v. Chadwick, 93 Fla. 114, 111 So. 538, 541. And rescission without physical cancellation may be granted where the decree of rescission will sufficiently protect the complainant's rights and cancellation of the instrument or contract involved is unnecessary or for some reason improper, as where the instrument is voidable as to the complainant but valid as to other parties thereto. Black on Resc. & Canc. Section 686. And so, in a case where a court of equity would be justified in declaring rescinded and void a parol agreement, and in requiring each party to restore to the other that which had been received by reason of the agreement thus abrogated, the decree of rescission would generally afford the complainant all the protection which he would need, there being no written evidence of the contract. We hold, therefore, that the mere fact that a bill for rescission of a contract does not show that the contract was in writing does not necessarily render the bill demurrable, unless it appears from the allegations of the bill that the contract was of such a nature that it would be void, being prohibited by law. No such contention, that is, that the contract here sought to be rescinded would, under the facts alleged in the bill, be void unless in writing, has been made by counsel.

Nor is it contended that the contract here in question could not be rescinded because it was of such a nature as that the statute of frauds (Section 5779 C. G. L.) would

have required it to be in writing. Executory contracts coming within the statute of frauds are generally held to be enforceable and voidable, but not void. 27 C. J. 310. It has been held that equity may in proper cases grant rescission of a contract entered into in disregard of the statute of frauds. Black on Resc. & Canc., sec. 318. And the consideration paid on a contract which is void may under some circumstances be recovered in an action at law for money had and received. Mayer v. First National Company, 99 Fla. 173, 125 So. 909.

Furthermore, we have held that where a bill sets out the contract in general terms, the presumption is that it is a legal and valid contract, and is in writing and signed by the party to be charged therewith, and that if the defendant desires to set up the statute of frauds as a defense, it must be done by a plea, or insisted upon in the answer; though if the bill in terms sets up a verbal contract, the defendant may demur. Maloy v. Boyett, 53 Fla. 956, 43 So. 243. In this connection, however, it should be noted that we have also held that if in a suit in chancery a party relies upon an instrument of writing as the basis for his right or defense, he should in his pleading state the substance thereof and file with or attach to such pleading as an exhibit such paper or instrument or a true copy thereof, or assign some reason for its non production. Citizens State Bank v. Jones, 131 So. 369, and cases therein cited. And this rule is generally applied in cases for rescission and cancellation. Black, section 670. And yet it must be admitted that in such cases the complainant is not relying mainly or directly for his right of recovery upon the contract, or its enforceability. The gist of his case is that the contract was procured by fraud, and that, whether it was in writing or not, enforceable or not, he is entitled to rescind and recover the money which he paid thereon. But we must agree with the prevailing rule in other jurisdictions that good pleading requires that a bill to rescind a

contract should set out the agreement, the parties thereto, and the time, place and circumstances of its execution; that at least the substance of the contract should be alleged in the bill, and if it was a written contract, a copy thereof should either be incorporated in the bill or attached as an exhibit thereto, and the bill should also show with reasonable certainty what complainant received under the contract, and that he had seasonably returned or offered to return the same after discovering the frauds.

Appellee further contends that the bill does not show that the plaintiff was injured by the alleged false representation; that there is no allegation that the 1/10 share in the syndicate was not worth all that complainant paid for it; that the words, "to his injury" allege a mere conclusion. But these general words must be construed in connection with the facts alleged, to the effect that the defendant, Mrs. Fowler, represented that he could obtain along with herself and Conley a 1/10 interest in the syndicate at the same price she and Conley were each paying for a like interest; that the three of them were going in on the same basis, $6,666.66 each; that it was thoroughly understood that he was paying the same amount that she was, and no more, and that he would not purchase otherwise; whereas, as a matter of fact she had already bought all three shares at $2,500.00 per share. This amounted to an invitation to complainant to enter into fiduciary relations with the defendants and required the utmost good faith. Regardless of the actual value of the shares, therefore, we think these allegations make it plain that complainant was injured, at least to the extent of the difference between $2,500.00 and $6,666.67, the amount he paid Mrs. Fowler on the strength of her representations. Under the circumstances alleged in the bill, the truth of which is admitted on demurrer, it was unconscionable for Mrs. Fowler to take from Willis anything in excess of what she was paying herself. She was inviting him to go in with her and Conley

for the purchase on an equal basis of the three 1/10 interests in the syndicate. Willis knew nothing whatever about the syndicate or its property. He did know that Mrs. Fowler was a large and experienced dealer in real estate. She represented to him that Conley was also a prominent operator in real estate. She held out to him the opportunity of going in with her and Conley on the same basis for the purchase of the three shares in the syndicate which were for sale by the three Jewish owners at $20,000.00, or $6,666.66 per share. She did not purport to be acting as a sales agent either for the syndicate or the "three Jews", nor did she intimate that she was selling her own property. She was requesting Willis to go in with her and Conley in the purchase of the three available shares in an enterprise which she knew Willis, a nonresident, knew nothing about except what she told him, and in regard to which he told her he knew nothing and was relying upon her judgment, but that if she and Conley, prominent real estate dealers, were buying two of the three shares at the price per share named, he would take the third share at the same price, but on no other basis.

Appellant contends that under the allegations of the bill Mrs. Fowler was thus inviting and inducing Willis to embark upon a joint adventure with her, thus placing the transaction within the rules governing such relations, one of which is that each joint adventurer is in duty bound to act in the utmost good faith with the other joint adventurers, and that neither is allowed to gain any secret advantage or profit at the expense of the others, which would be inconsistent with the fiduciary relations thus created; citing among other cases, Menefee v. Oxnam, 183 Pac. 379, and Selwyn v. Waller (N. Y.) 105 N. E. 321. See also 33 C. J. 851; Proctor v. Hearne, 131 So. 173. But appellees insist that this rule only applies to the original joint adventurers; that the bill shows that the Warren-Leach syndicate had already been formed, and that Mrs. Fowler

was not proposing that she and complainant acquire a joint interest in any particular share, but each a separate 1/10 interest in the joint adventure already organized; that therefore she was not proposing that they become joint-adventurers in the ordinary meaning of that term. To this argument appellant says that Mrs. Fowler's proposal was in effect to form a joint adventure for the purpose of acquiring these three 1/10 interests, and that it amounted to a joint adventure for this limited purpose; citing Bond v. O'Donald, 205 Ia., 902, 63 A. L. R. 901, and Langdon v. Kenedy (Neb.) 63 A. L. R. 896, 900. Whether the parties to a particular contract have thereby created as between themselves the relation of joint adventurers depends upon their intention, which is to be determined in accordance with the ordinary rules governing the interpretation of contracts. 33 C. J. 845. A joint adventure is very similar to a partnership, the chief distinction being that where a partnership is ordinarily formed for the transaction of a general business of a particular kind, a joint adventure is usually, but not necessarily, limited to a single transaction, though the business of conducting it to a successful termination may continue for a considerable period of time. 33 C. J. 842. A joint adventure has also been defined as a special combination of two or more persons, where, in some specific venture, a profit is *jointly* sought without any actual partnership or corporate designation. Proctor v. Hearne, 131 So. 173; 63 A. L. R. 910. And it has been held in several jurisdictions that there must be a joint proprietary interest and right of mutual control over the subject matter of the adventure (See cases cited in 63 A. L. R. p. 911), and it can only be created by a voluntary agreement between the parties to it. 33 C. J. 847. The joint adventurers are entitled to share in the profits, and must also share the losses, if any, which result. Proctor v. Hearne, *supra*. We cannot say therefore that Mrs. Fowler's proposition to Willis, which was accepted by him, created in a technical

sense a joint adventure between her and Willis, or between her and Willis and Conley, as to the purchase of these three shares in the existing syndicate. The proposition contemplated the purchase by each of them of separate shares or interests in an existing joint adventure formed by other parties, which purchase if properly carried out, might have made them joint adventurers with several other parties in the already existing joint adventure, but there would have been no right upon Mrs. Fowler's part to share in Willis's profits or duty to share his losses arising from his purchase of his 1/10 interest, or vice versa, in the absence of an agreement between them to that effect, and no such agreement is alleged. Mrs. Fowler's proposal to Willis assumed that these shares or interests in the Warren-Leach syndicate were transferable without any action on the part of the other members of the syndicate. So it is not necessary for us to pass upon that question. See in this connection 33 C. J. 850. Thus the proposition, while not itself a joint adventure, would have resulted, if carried through as proposed by her, in Mrs. Fowler and Willis each becoming joint adventurers on the same basis in an existing syndicate, in which the several members would sustain, each to each of the others fiduciary relations; it was therefore an invitation to enter into fiduciary relations; and under the circumstances alleged in the bill, we conclude that Mrs. Fowler, in her negotiation with Willis to enter into such fiduciary relations with her, was in duty bound to deal with Willis in the utmost good faith. The very nature of the proposal as alleged in the bill was such as was naturally calculated to cause Willis to repose confidence and trust in the one making the proposal, and required on the proposer's part entire fairness and good faith, and the truthful disclosure of the actual amount at which the alleged owners were selling the three shares. See Stephens v. Orman, 10 Fla. 9, 86. As was said in Dale v. Jennings, 90 Fla. 234, 107 So. 175: "The fact of invited confidence necessarily carries

with it the superlative degree of frankness and square dealing." See also Quinn v. Phipps, 93 Fla. 805, 113 So. 419. If Mrs. Fowler had held herself out, or had been merely acting, as a broker employed to sell the syndicate shares for their owners, the principles enunciated in Huttig v. Nessey, 130 So. 605, might have applied, but such was not the case made by the bill. Nor are the facts alleged here analagous to those involved in the case of Pryor v. Oak Ridge Development Co., 97 Fla. 1085, 119 So. 326.

The relationship of the parties as disclosed by the bill, while not exactly analogous, is very nearly similar to that of joint purchasers and joint adventurers. "Where one person occupies toward another the position of a joint purchaser, it becomes his duty fully and honestly to disclose the true purchase price of the property to be acquired, and he lays himself open to an action of fraud and deceit if he misrepresents the matter and induces his associate to contribute more than his share of the actual consideration paid." Black on Resc. & Canc. Sec. 52, citing Bowman v. Patrick (C. C.) 36 F. 138; Crossman v. Bancon, (M. E.) 109 Atl. 487. In another illustrative case, lessees of a mining property held an option to purchase it for $75,000.00, but they also had a separate agreement with the owner to refund them $35,000.00 in case they bought at the price named in the option. They solicited one P. to join them in the purchase of the mine, showing him the option, but concealing the fact that the other agreement existed. He agreed to take a half interest in the property for $37,500.00. The lessees had not enough money to carry out their part of the purchase, and applied to C. to advance funds to them. To him they disclosed all the facts and showed both the agreements, and he agreed to advance the money necessary to make the payments until the real consideration ($40,000.-00) should be paid, and then he was secretly to receive the subsequent payments made by P. For this accommodation he was to receive interest on his money and also a third in-

terest in the lessees' half of the property. A first payment of $20,000.00 was made, but then P. became suspicious and refused to pay any more, and through some arrangement with the lessees, C. completed the payments and obtained title to the property. It was held that by intentionally joining with the others in the deception of P., he became a joint purchaser and assumed the obligations of good faith incident to that relationship, and that both he and the property in his hands were liable for the amount necessary to make restitution for the fraud. Cunningham v. Pettigrew, 169 Fed. 335, 94 C. C. A. 457, cited in Black on Resc., Sec. 52.

Aside from the question of whether a relation of trust and confidence was created, the bill shows false representations of material facts. We are not unmindful of the general rule that representations in regard to value are regarded as expressions of opinion on which the purchaser has no right to rely, and which afford no ground for rescission, especially where the parties are dealing at arms length and on equal terms. Glass v. Craig, 83 Fla., 408, 91 So. 332. But it has been held that where one of the parties to a contract of sale is in possession of exclusive or greatly superior knowledge of the value of the subject matter, as where an officer of a corporation, with full knowledge, makes a statement to a prospective purchaser of its stock, a mere member of the general public, as to what the stock is worth, his statement will be regarded as the statement of a matter of fact, rather than of opinion, and if false and fraudulent, the sale may be rescinded. Miller Estate, Inc., v. Drury, 208 Pac. 77; Butler v. Martin, 247 Mass. 169, 142 N. E. 42. If the seller of property, in addition to stating its value, states material facts within his particular knowledge, which he wishes to impress on the purchaser as demonstrating what the property is worth, and which are calculated to do so, his mere assertion as to value may be the expression of an opinion, but if his representations as to such material

facts are false and fraudulent, they will afford ground to avoid the contract. Black on Resc. & Canc., Sec. 83, and cases cited; Nixon v. Temple Terrace Estates, 97 Fla. 392, 121 So. 475; Holgate v. Jones, 93 Fla. 269, 113 So. 714; Homeseekers Realty Co. v. Menear, decided at the present term. And a representation that an option to purchase property at a specified price has been obtained, when in fact rebate from such price is to be made, constitutes a fraud and deceit when it induces others to join in the purchase of such property. Vennum v. Palmer, 123 Ill. App. 619.

We come now to the contention of appellees that the bill shows on its face that the complainant had an adequate and complete remedy at law, and that the equity court was therefore without jurisdiction, and could not be held in error in sustaining the demurrer and dismissing the bill.

Undoubtedly the indications are very strongly to the effect that the complainant, under the facts alleged, in the bill, could have maintained an action at law in general assumpsit for money had and received. This it could have done, too, without affirming the contract, but in disaffirmance of it; though if complainant had sued in tort to recover damages in an action for deceit, this would probably have implied an affirmance of the contract. 39 Cyc. 1996, et seq. 41 C. J. 46; 2 Encyc. Pldg. & Prac. 1016. An action for money had and received may be proved by any legal evidence showing that the defendant has possession of money of the plaintiff which in equity and good conscience he ought to pay over. Bishop v. Taylor, 25 So. 287, 41 Fla. 77; Cullen v. Seaboard Air Line R. Co., 63 Fla. 122, 58 So. 182. The fact that plaintiff had rescinded or attempted or offered to rescind the contract would not preclude him from maintaining such an action. Evans v. Givens, 22 Fla. 476; Cox v. Grose, 97 Fla. 848, 122 So. 513. Indeed, a count for money had and received has been likened to a bill in equity. Gordon v. Camp, 2 Fla. 422, 426.

This court has frequently held that where there is a full,

adequate and complete remedy at law, and the bill presents no independent equity, and the only relief sought, or which can appropriately be granted, is one for which the law provides an adequate and complete remedy, resort to a court of equity is unnecessary and improper. See 1 Fla., Digest, 776 et seq. This doctrine harmonizes with our constitutional provision that the right of trial by jury shall be preserved inviolate. It has been very strictly adhered to by the Federal Courts. Thus, in Buzard v. Houston, 119 U. S. 347, 20 Law ed. 451, it was held that where a bill in equity was filed for the purpose of having annulled an assignment of a contract for the sale of cattle, and for the reinstatement of a contract between the complainants and defendant for which the assignment had been substituted, the bill alleging fraudulent representations by the defendant and praying discovery, but where it appeared from the facts alleged that the only relief the complainants could rightfully obtain was a decree for pecuniary damage, the dismissal of the bill was proper. It was called attention to in that case that under the Judiciary Act of 1789, it was expressly provided that, ''Suits in equity shall not be sustained in either of the courts of the United States, in any case where plain, adequate and complete remedy may be had at law.'' But it was also said in that case that:

''In England, indeed, the court of chancery in cases of fraud, has sometimes maintained bills in equity to recover the same damages which might be recovered in an action for money had and received. But the reason for this, as clearly brought out by LORDS JUSTICES KNIGHT, BRUCE and TURNER in Slim v. Croucher, 1 D. F. & J. 518, 527, 528, was that such cases were within the ancient and original jurisdiction in chancery, before any court of law had acquired jurisdiction of them, and that the assumption of jurisdiction by the courts of law, by gradually extending their powers, did not displace the earlier jurisdiction of the court of chancery. Upon any other ground, such bills could not be maintained Clifford v. Brooke, 13 Ves. 131; Thompson v.

Barclay, 9 Law Jour. Ch. 215, 218. And we have not been referred to any instance in which an English court of equity has maintained a bill in such a case as that now before us. In Newham v. May, 13 Price, 749. CHIEF BARON ALEXANDER said: 'It is not in every case of fraud that relief is to be administered by a court of equity. In the case, for instance, of a fraudulent warranty on the sale of a horse, or any fraud upon the sale of a chattel, no one, I apprehend, ever thought of filing a bill in equity'."

The rule that where the only relief obtainable on a bill in equity is one for which an adequate remedy at law exists, the bill will not be sustained, has been recognized by this court. Montgomery v. Knox, 20 Fla. 372; Tampa & Gulf Coast R. Co. v. Mulhern, 73 Fla. 146, 74 So. 297. Some substantial ground of equitable jurisdiction must be both alleged and proven before a mere money decree will be granted. Gentry Futch Co. vs. Gentry, 90 Fla. 595, 106 So. 473.

It appears, however, that the state courts have recognized a so-called concurrent jurisdiction in both law and equity courts in certain cases where fraud is involved. See 8 Encyc. Pldg. & Prac. 890-893, where the text, supported by numerous citations of cases reads:

"The redress of a party who has been led into a transaction by false representations and deceit is not confined to his legal action and remedies, but he may seek appropriate relief in equity, although a concurrent remedy at law may be available to him if he sees fit to pursue it.

"Although a party may of his own motion treat a contract as rescinded upon discovery of the imposition practiced upon him, or may pursue his remedy at law for damages after ratifying the contract, he may also file a bill in equity for a rescission of the contract when this method furnishes him more adequate relief."

Mr. Pomeroy, in his work on Equity Jurisprudence, has an entire chapter devoted to this subject of concurrent jurisdiction. He begins by saying (section 173, 4th ed.):

"The Concurrent Jurisdiction, as stated in a former

section in this chapter, embraces all those civil cases in which the primary right, estate, or interest of the complaining party sought to be maintained, enforced, or redressed is one which the remedy conferred is also of the same kind as that administered, under the like circumstances, by the courts of law. The primary right, estate, title, or interest which is the foundation of the suit must be legal, or else the case would belong to the exclusive jurisdiction of equity; and the law must, through its judicial procedure, give *some* remedy of the same general nature as that given by equity; but this legal remedy is not, under the circumstances, full, adequate and complete. The actual foundation of this *concurrent* branch of the equitable jurisdiction, the essential principle to which every instance of its exercise must finally be referred, is therefore the inadequacy, incompleteness, or insufficiency of the legal remedies which can be granted by courts of law to the litigant parties.''

In treating this subject, Black, in his work on Rescission, (Section 643) says:

''Courts of equity have jurisdiction to grant relief, by way of rescission or cancellation, against contracts or conveyances procured by means of deception, fraudulent concealment, false representations, or fraud in any of its other forms of manifestations. This jurisdiction is sometimes said to be concurrent with that of the courts of law. That is to say, fraud is a species of tort, which may lay a foundation for an action at law, in which compensation is claimed by way of damages. But this does not exclude the wider jurisdiction of equity, under which a fraudulent transaction may be unravelled, the contract of transfer completely undone, and the parties restored to their former position. If the remedy which the law affords, a recovery of damages, is adequate to the case, equity may properly refuse to interfere. But if the injury caused by allowing the contract to stand would be irreparable, if no proceeding at law would afford adequate relief, or if complete justice can be done only by rescinding the fraudulent transaction, then the jurisdiction of equity is clear and undoubted. A court of law, it should be observed, can award damages for the breach of a contract or for the deceit or fraud by which a party

was induced to enter into it, but cannot rescind a contract or cancel a deed. But in equity, on the other hand, when a case of fraud is established, the court may set aside all transactions founded on it, however they may have been effected, and notwithstanding any contrivance by which it may have been attempted to protect them, and may also treat acts as having been done which ought to have been done, and convert the party who has committed a fraud and profited by it into a trustee for the injured party.''

And in section 645 of the same work, we find this:

''It is a general rule that a court of equity will not interfere to order or enforce the rescission of a contract or decree the cancellation of a written instrument where the law affords the complaining party a plain, adequate, and complete remedy for the injuries he claims to have suffered.''

It would appear from the above that the doctrine which has long obtained in this jurisdiction is in line with the weight of authority, and we see no need to depart therefrom.

If follows from what has been said that the mere fact that appellant could have maintained a suit at law for money had and received would not preclude him from seeking rescission and restoration in equity if he has sufficiently alleged facts which show that the legal remedy would not be full and complete. In this connection, appellant contends that a judgment in his favor in a law action would still leave the contract in existence and also leave him the owner of the 1/10 interest in the syndicate, and subject to the liabilities attaching thereto; citing Bosley v. National Machine Co., 123 N. Y. 550, 25 N. E. 990; Black, Resc. sec. 646. This might be true, if the law action were one for damages for deceit, but it has not been made plain to us that such would necessarily be the result of an action for money had and received. 39 Cyc. 1999, 2001, 2014. The evidence to sustain such an action should show disaffirmance of the contract or an offer to rescind the same, seasonably made and for sufficient reason, and return or an offer

to return what had been received thereunder, before the plaintiff, under such facts as are alleged in the bill, would be entitled to recover what he had paid on the contract. Aside from this, however, the bill in this case does not clearly show that the complainant ever actually received the one-tenth interest in the syndicate, or the lands it had purchased, or any document or instrument of any sort evidencing the same. And so it does not clearly appear that complainant ever actually became liable as a joint adventurer with and to the other persons comprising the Warren-Leach syndicate, nor the nature or extent of that liability. In fact the bill does not allege any such liability. If it had shown that the interests of the members of the syndicate were involved in the case, they should have been made parties to the suit. The bill alleges that complainant agreed to purchase a 1/10 interest, but it does not allege that he received it, nor the shape or form in which he received it, if ever. Nor does the bill allege that complainant, when he offered to rescind and demanded his money back, returned or reconveyed or assigned, or offered to return or reconvey or assign, to the defendant, a one-tenth interest in the syndicate, or in and to the lands it had purchased. The bill merely alleges generally that complainant offered to return to the defendant "all considerations received by him", and "now offers to do equity". This vagueness and uncertainty of allegation as to material matters was sufficient to justify the court in sustaining the demurrer.

It is well settled that, since the prime object of rescission or cancellation is to undo the original transaction and restore the former status, the complainant in his bill must offer to restore to the defendant the property or consideration which he may have received under it, specifically describing the same; and further, he should show that he is able to make such restoration or allege facts from which it may be fairly inferred. Taylor v. Rawlins, 86 Fla. 279, 97 So. 714; Same case, 90 Fla. 621, 106 So. 424; Dekle v. Mone,

94 Fla. 1211, 115 So. 514; Black, Resc. sec. 672. "The power of a court of equity to cancel a contract, while well recognized, is exceptional, and it will not interfere with freedom of contract or substitute itself for legal remedies, even though bad and improvident bargains have been entered into". International Realty Association v. McAdoo, *supra*. It follows that a bill invoking the exercise of this power should be clear and explicit in its allegations of facts showing the requisite equitable grounds for the relief prayed. Although the bill may formally pray rescission and cancellation, yet if on the facts alleged, (or omitted to be alleged), it appears that complainant is not entitled to any relief, or it appears that the only relief which could be granted would be the same, or substantially the same, as could be secured in an action at law, equity will not interfere; and where the bill leaves these essential matters doubtful, and the trial court sustains a demurrer thereto, this court should not reverse such ruling.

But while we cannot hold the court below in error in sustaining the demurrer, we think that under the circumstances, leave to amend should have been granted before dismissing the bill. For that reason, we conclude that the order, in so far as it dismissed the bill was erroneous, and that the same should be reversed and remanded for further proceedings not inconsistent with the views hereinabove expressed.

It is hardly necessary for us to pass upon the order of the court sustaining the exceptions to those portions of the bill, in the nature of a creditor's bill. We might observe, however, that under section 5035 C. G. L., a creditor's bill may only be filed by a creditor who has either reduced his claim to judgment, or has instituted a suit in a proper court of law for its collection. Armour Fertilizer Works, vs. First National Bank, 87 Fla. 436, 100 So. 362. The insolvency of the defendant affords no exception to the rule. Tampa & R. C. R. Co. v. Mulhern, 73 Fla. 146, 74 So. 297. To

bring a case within the exception to the general rule which is made in Claflin v. Ambrose, 37 Fla. 78, 19 So. 628, the case made by the bill must be one of exclusive equity jurisdiction. It was said in that case: "This is a suit by the creditor of a partnership against the administrator of a deceased partner to enforce the payment of a partnership debt out of his estate. No action at law will lie; hence the principle that the creditor must exhaust his remedies at law before he can successfully invoke the aid of equity, does not apply to this case. Courts of equity have exclusive jurisdiction in cases of this character;" etc. With the bill as drawn, we cannot say that the complainant brought himself within the exception exemplified by the case cited. Whether he can so amend his bill as to do so, it is not necessary for us now to consider. We cannot say that the court below erred in sustaining the exceptions referred to.

For the reasons above pointed out, the order of the court dismissing the bill is reversed. In other respects, the orders of the court appealed from are affirmed.

Reversed in part and affirmed in part, and remanded.

BUFORD, C.J., AND WHITFIELD, TERRELL AND DAVIS, J.J., concur.

ELLIS, J., dissents.

ELLIS, J., dissents:—Assuming the allegations of the bill to be true, I agree that it was unconscionable in Mrs. Fowler to lie about the price she and Conley paid for the three-tenths interests of the Jews in the "Syndicate", a one-third part of which she was then selling to complainant, but it was a prevarication which in no-wise affected the quality or related to the material substance of the thing purchased. Nor was there any allegation that the complainant received anything differing in substance from that which he thought he was purchasing. What he purchased was a one-tenth interest in the "Warren-Leach Syndicate" which was purchasing 104,000 acres of land from the Central Florida Lumber Company. The complainant simply agreed to buy

and did buy a one-tenth interest in the enterprise for the sum of $6,666.67 which he was assured both Mrs. Fowler and Conley were each doing.

The fact that Mrs. Fowler and Conley had acquired the three-tenths interest of the Jews for less should have been truthfully represented to complainant by her, especially as she introduced the subject, but it is difficult to understand how the legal merits of the transaction could be affected by the sharp practice of the woman trader. Suppose she had acquired the three-tenths interest by trading to the Jews some other holdings which she valued at $20,000. but which in fact were worth much less on the market than that sum, of which the Jews were ignorant, a most unlikely supposition, it may be said, but not entirely impossible. Would the sale of the one-tenth interest to complainant be held to be void for fraud?

Or suppose the three-tenths interest in the Syndicate had been held by some relative of hers who had in a burst of generosity given her the shares. Would the sale of a third interest to complainant be held void for fraud because Mrs. Fowler represented that the three-tenths interest cost her three times the amount she was charging complainant for a third interest in them?

I perceive nothing in the transaction but a certain undue and perhaps immoral liberty of speech commonly present in so-called business or commercial transactions, which the public usually takes cum grano salis, and something of wounded vanity on the complainant's part that he was not in on the ground floor with the woman trader.

In this view of the case I cannot agree to the learned opinion of my associate MR. JUSTICE BROWN.